In the Matter of the TITLE, BALLOT TITLE AND SUBMISSION CLAUSE, AND SUMMARY ADOPTED FEBRUARY 19, 1992, Pertaining to the Proposed Tobacco Tax, and Motion for Rehearing Denied on March 6, 1992.

Pat R. Stealey, Petitioner,

and

Swanee Hunt and Lila Gracey, Respondents,

and

Natalie Meyer, Gale Norton and Douglas Brown, Title Setting Board.

No. 92SA117.

Supreme Court of Colorado, En Banc.

May 26, 1992.

Hays and Wilson, James C. Wilson, Jr., Mark Bender, Denver, for petitioner.

Dubofsky & Phelan, Jean E. Dubofsky, Boulder, for respondents.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Maurice G. Knaizer, Deputy Atty. Gen., Denver, for Title Setting Bd.

Justice LOHR delivered the Opinion of the Court.

In this review proceeding brought pursuant to section 1–40–102(3)(a), 1B C.R.S. (1991 Supp.), petitioner Pat R. Stealey, a

registered elector of the State of Colorado, challenges the title, ballot title and submission clause, and summary formulated by the title setting board (Board) for a proposed initiated statute concerning an increased tax on cigarettes and tobacco products for purposes including aid to the medically indigent. Stealey contends that the title and ballot title and submission clause are infirm because they are unfair and do not clearly express the true meaning and intent of the proposed statute. Stealey also maintains that the summary is not a clear and concise statement of the proposed initiative, that it is not an impartial statement of the proposal, and that it is misleading. We affirm the action of the Board in designating the title and the ballot title and submission clause for the proposed statute and in preparing the summary.

## I.

In general, the initiative proposes to amend the Colorado Revised Statutes to increase taxes on cigarettes and tobacco products in Colorado. Certain of the revenue from the tax increase would be used primarily to provide health care for the medically indigent and persons who cannot qualify for or afford health insurance. Moneys would also be utilized for research and education about and prevention of tobacco-related illnesses, and for teacher training programs.[1]

More specifically, the initiative proposes to repeal sections 39–26–114(1)(a)(IV), and 39–26–203(1)(j), 16B C.R.S. (1982), which exempt cigarettes from state sales and use taxes and certain local sales taxes. It proposes an initial increase in the state tax on wholesale cigarette sales of thirty-five cents per pack of twenty cigarettes, *see* § 39–28–103, 16B C.R.S. (1991 Supp.), and an increase in the state tax on the sale, use, consumption, handling, or distribution of other tobacco products from twenty percent of the manufacturer's list price, as presently authorized, *see* § 39–28.5–102, 16B C.R.S. (1991 Supp.), to fifty-five percent of that price. The initiative would require these rates to be adjusted annually to reflect any increase in the medical care component of the regional consumer price index for the region including Colorado.

The initiative would require revenue derived from the tax increases on wholesale cigarette sales and on other tobacco products to be allocated in the following manner:

(a) Not less than fifty percent to programs for people who do not qualify for or cannot afford health insurance or to programs to provide health care for the medically indigent; (b) up to twenty five percent for research and education about and prevention of tobacco-related illness, including cessation of smoking; (c) not more than one percent for the costs of administration of the commission's activities; and (d) the remainder to teacher training projects designated by the commission. Any revenues not allocated by the commission shall revert to the general fund.

Appendix, p. 3. It would establish a state commission on tobacco and health under the charge of the department of health. The commission would have the power (1) to issue rules and regulations in accordance with the State Administrative Procedure Act[2] to carry out the purposes of the initiative, (2) to develop guidelines for distributing the tax revenue derived from the increase in tax rates in conformity with the above standards, (3) to establish evaluation criteria for and to evaluate funded programs, (4) to audit expenditures, and (5) to report to the governor and the general assembly on the expenditure of revenues. Additionally, the initiative contains a provision designed to protect municipalities currently entitled to a portion of existing cigarette tax revenue obtained pursuant to section 39–22–623, 16B C.R.S. (1991 Supp.), from possible revenue losses resulting from any decrease in the sales of cigarettes. It also repeals the prohibition contained in that section against imposition of local sales or use taxes on cigarettes as a

---

1. The initiative is set forth in full as an appendix to this opinion.

2. §§ 24–4–101 to –108, 10A C.R.S. (1988 & 1991 Supp.).

condition for receiving state income tax revenue.

As required by statute, the proponents of the initiative, Swanee Hunt and Lila Gracey, submitted a draft of the initiative petition to the directors of the legislative council and the office of legislative legal services for review and comment. *See* § 1–40–101(1), 1B C.R.S. (1991 Supp.); *see also* Colo. Const. art. V, § 1(5). After comments were received and a public meeting held, the draft of the initiative petition was presented to the secretary of state, who then convened the Board[3] to designate and fix a title and a ballot title and submission clause, and to prepare a summary. The Board held a public meeting on February 19, 1992, to perform these functions pursuant to the requirements of section 1–40–101(2). Prior to this time, the Board requested and received information from both the office of state planning and budgeting (OSPB) and the department of local affairs (DLA) regarding the fiscal impact of the proposed initiative. The OSPB concluded that the provision protecting municipalities from possible revenue losses could have a negative impact on the state general fund but that "the impact is undetermined." Letter, OSPB to secretary of state, February 14, 1992. It also concluded that the impact of the tobacco products tax increase and the repeal of the exemption of cigarettes from state sales and use taxes "is undetermined." *Id.* The DLA found that "the proposed initiative will have an indeterminate positive fiscal impact on local governments in the state." Letter, DLA to secretary of state, February 18, 1992. At the meeting, Stealey presented the testimony of Dr. Dwight Lee, a professor of economics at the University of Georgia. Dr. Lee opined that the initiative would result in a substantial loss of general fund revenue and a reduction in the revenue collected through the sales tax.[4]

At the close of the meeting, the Board set the title, ballot title and submission clause, and summary for the proposed measure. The title designated and fixed by the Board states:

AN ACT TO INCREASE TAXES ON CIGARETTES AND TOBACCO PRODUCTS AND TO AUTHORIZE A STATE COMMISSION TO DISTRIBUTE A PORTION OF REVENUES MADE AVAILABLE FROM THE INCREASE FOR HEALTH CARE PROGRAMS FOR THE MEDICALLY INDIGENT AND UNINSURED, FOR RESEARCH AND EDUCATION ABOUT AND PREVENTION OF TOBACCO–RELATED ILLNESS, AND FOR TEACHER TRAINING.

Likewise, the ballot title and submission clause designated and fixed by the Board states:

SHALL THERE BE AN ACT TO INCREASE TAXES ON CIGARETTES AND TOBACCO PRODUCTS AND TO AUTHORIZE A STATE COMMISSION TO DISTRIBUTE A PORTION OF REVENUES MADE AVAILABLE FROM THE INCREASE FOR HEALTH CARE PROGRAMS FOR THE MEDICALLY INDIGENT AND UNINSURED, FOR RESEARCH AND EDUCATION ABOUT AND PREVENTION OF TOBACCO–RELATED ILLNESS, AND FOR TEACHER TRAINING?

The Board prepared the following summary:

The measure increases the state excise tax rate on cigarettes by 17.5 mills per cigarette (35¢ per pack of 20 cigarettes) and increases the state excise tax on tobacco products to 55% of the manufacturer's list price. It provides for an annual adjustment to state cigarette and tobacco products excise taxes to reflect increases in the medical care component

---

**3.** The Board is composed of the secretary of state, the attorney general, and the director of the office of legislative legal services or that official's designee. § 1–40–101(2).

**4.** At the February 19 meeting Dr. Lee testified that the initiative would result in a first year loss to the general fund of $14,700,000. This

testimony, however, did not completely reflect the effect of subjecting cigarettes to the state sales tax. In revised testimony, presented to the Board on March 6, 1992, at the meeting on the motion for rehearing, Dr. Lee revised his estimate and opined that the first year loss to the general fund would be $4,900,000.

of the regional consumer price index for the region that includes Colorado.

The measure creates a state Commission on Tobacco and Health. It authorizes the commission to distribute an amount equal to revenues generated from the increased state excise taxes as follows: Not less than 50% for health care programs for persons who cannot afford or qualify for medical insurance and for the medically indigent; not more than 25% for research and public education on tobacco-related illnesses; not more than 1% to cover the administrative costs of the commission; and any remaining amounts for teacher-training programs.

The measure guarantees to municipalities and counties distribution in the aggregate of an amount not less than the revenues from state cigarette taxes that were distributed to municipalities and counties in fiscal year 1990–91. It expresses the people's intent that revenues for medically indigent programs be in addition to current funding for such programs, and that the General Assembly not decrease funding for the programs.

The measure repeals the current exemption for cigarettes from state sales and use taxes and from local sales taxes administered by the state. The measure also repeals the prohibition on municipalities' and counties' imposing sales or use taxes on cigarettes if they are to receive an amount equivalent to a portion of the state excise tax on cigarettes. The revenue from repeal of the sales and use tax exemption on cigarettes would be available to the state General Fund for the state sales and use tax and to local government for local sales and use taxes. The act would be effective April 1, 1993.

The fiscal impact of this measure is variable depending on the elasticity of sales of cigarette and tobacco products. This measure would increase state cigarette and tobacco tax revenues and would increase state and local sales and use tax revenues on cigarettes. It would allow an increase in local government revenues by an indeterminate amount. These increases could be offset by reduction in cigarette and tobacco sales and sales of associated items. The net effect of these changes on state or local government revenues is not known.

Stealey moved for rehearing, and the Board held a public meeting to consider the language changes he sought. At the conclusion of the meeting the Board voted unanimously to deny any changes suggested by Stealey.

## II.

Article V, section 1, of the Colorado Constitution reserves to the people the power of initiative "to propose laws and amendments to the constitution and to enact or reject the same at the polls independent of the general assembly." The procedural statutes prescribing the manner of exercising the right of initiative "were adopted to facilitate the exercise of this right." *Brownlow v. Wunsch,* 103 Colo. 120, 131, 83 P.2d 775, 780 (1938) (decided under former law). Section 1–40–101(1) requires the proponents of an initiative petition to submit the original draft of the petition "to the directors of the legislative council and the office of legislative legal services for review and comment." *See also* Colo. Const. art. V, § 1(5). Comments are presented to the proponents at a public meeting no later than two weeks after the date of submission. *Id.;* § 1–40–101(1). This procedure is designed to give proponents the opportunity to amend the petition in response to any comments received. § 1–40–101(1); *see also In re Title Pertaining to a Proposed Initiative for an Amendment to Article XVI, Section 5, Colorado Constitution, Entitled "W.A.T.E.R.,"* 831 P.2d 1301, 1305 (Colo.1992). The initiative must then be submitted to the secretary of state, who assembles the Board for the purpose of preparing the title, ballot title and submission clause, and summary for the proposed law. § 1–40–101(2).

The Board must consider the following standards when carrying out this task. The title, by definition, shall be "a brief statement that fairly and accurately repre-

sents the true intent and meaning of the proposed text of the initiative." § 1–40–100.3(6); *see also* § 1–40–101(2). The ballot title is the language that will be printed on the ballot and is "comprised of the submission clause and the title." § 1–40–100.-3(1). It "shall be brief, shall not conflict with those selected for any petition previously filed for the same election, and shall be in the form of a question which may be answered 'yes' or 'no' and which shall unambiguously state the principle of the provision sought to be added, amended, or repealed." § 1–40–101(2); *see also* § 1–40–100.3(4). The summary is "a condensed statement as to the intent of the proposed law or constitutional amendment." § 1–40–100.3(5). It must "be true and impartial and shall not be an argument, nor likely to create prejudice, either for or against the measure." § 1–40–101(2). If the Board believes the proposed law will have a fiscal impact on the state or any of its political subdivisions, it shall request fiscal impact information from the OSPB or the DLA. *Id.* "[T]he summary shall include an estimate of any such fiscal impact, together with an explanation thereof." *Id.*

After the title, ballot title and submission clause, and summary have been fixed by the Board, any registered elector may file a motion for a rehearing with the secretary of state based on a contention that they are "unfair or that they do not clearly express the true meaning and intent of the proposed law or constitutional amendment." § 1–40–102(3)(a). If overruled, the elector has the right to obtain review in this court. *Id.* The standards governing our review of board action are well established:

"(1) [W]e must not in any way concern ourselves with the merit or lack of merit of the proposed [initiative] since, under our system of government, that resolution rests with the electorate;

(2) All legitimate presumptions must be indulged in favor of the propriety of the Board's action; and

(3) Only in a clear case should a title prepared by the Board be held invalid."

*In re Title Pertaining to Casino Gaming Initiative Adopted April 21, 1982,* 649

P.2d 303, 306 (Colo.1982) (quoting *Bauch v. Anderson,* 178 Colo. 308, 310, 497 P.2d 698, 699 (1972) (brackets in *Casino Gaming* )); *accord, e.g., In re Title Pertaining to "W.A.T.E.R.,"* 831 P.2d at 1305; *In re Proposed Constitutional Amendment Concerning Limited Gaming,* 826 P.2d 1241, 1245 (Colo.1992).

### III.

■■■ It is within the foregoing framework that we address Stealey's arguments. Stealey contends that the title and ballot title and submission clause designated by the Board are legally infirm because they omit mention of certain of the provisions of the proposed statute. A ballot title and submission clause must be brief, § 1–40–101(2); *In re Initiated Constitutional Amendment Respecting the Rights of the Public to Uninterrupted Service by Public Employees,* 200 Colo. 141, 144, 613 P.2d 867, 869 (1980), and need not "describe every feature of a proposed measure in the title or in the ballot title and submission clause," *Title Concerning Limited Gaming,* 826 P.2d at 1244. Additionally, the Board is given considerable discretion in resolving the interrelated problems of length, complexity, and clarity in designating a title and ballot title and submission clause. *In re Initiative Concerning "State Personnel System,"* 691 P.2d 1121, 1125 (Colo.1984).

■■■ Stealey first argues that the title and ballot title and submission clause are fatally defective because they do not state that the commission established by the proposed legislation has been delegated the authority to issue rules and regulations pursuant to the State Administrative Procedure Act (APA), §§ 24–4–101 to –108, 10A C.R.S. (1988 & 1991 Supp.). He asserts that this omission is misleading because voters will not be fully apprised of the power being delegated to the commission under the initiative.

The delegation of power to the commission to promulgate rules and regulations is circumscribed. The power granted is "to issue rules and regulations in accordance with [the State Administrative Procedure

Act] to carry out the purposes of this [legislation]." The power is limited to carrying out the purposes of the proposed measure described in the title and ballot title and submission clause. Furthermore, the APA restricts agency rulemaking power to that "delegated to the agency and as authorized by law." § 24–4–103(8)(a). Addition of language detailing the commission's rulemaking power would increase the length of the title and ballot title and submission clause while providing little information that would advance voters' understanding of the initiative. Because the delegation of rulemaking power is limited, we are satisfied that omission of a reference to the commission's authority to establish rules and regulations will not mislead voters.

■ Stealey also argues that the title and ballot title and submission clause are misleading because they fail to inform the electorate that the proposed law will impose sales and use taxes on cigarettes. Stealey asserts that this is a central feature of the initiative and that its inclusion is critical to a proper understanding of the proposed measure. He suggests that the phrase "impose sales taxes and increase the excise tax" be substituted for the general statement that the measure would "increase taxes" on cigarettes and tobacco products.

The proposed measure would require an increase in existing excise taxes levied on cigarettes and other tobacco products. It would also repeal the present exemption for cigarettes from state, and certain local, sales and use taxes. The repeal would result in an automatic increase in the state sales and use taxes for cigarettes and also in those local sales taxes for cigarettes that are administered by the state.[5] Stealey's proposed language would provide a more detailed explanation of the types of tax increases contained in the initiative. How-

ever, his suggested change would not likely lead to improved voter understanding of the proposed measure because many voters may not realize or attach importance to the distinction between an excise tax and a sales tax.[6] It is sufficient that voters are apprised, in general, that taxes on cigarette and other tobacco products would increase under the proposed measure.

■ Stealey lastly argues that the Board's omission of limiting language in the title and ballot title and submission clause informing voters that the teacher training projects funded by the increased tax revenue will be those designated by the commission misleads voters to believe that all teacher training projects would be subject to possible funding. The proposed legislation would authorize the commission to designate the programs that are entitled to receive funding whether the programs be for the medically indigent, for research and education about tobacco-related illnesses, or for teacher training. Stealey's proposed change suggests that the Board's discretion extends only to funds to be used for teacher training. As a result, his proposed language could lead to voter confusion over the true meaning of the initiative. Moreover, the commission's authority to designate which teacher training programs receive funding is not a central feature of the proposal, and accordingly the Board was within its discretion to omit this information. *See In re Proposed Initiative Concerning Drinking Age in Colorado*, 691 P.2d 1127, 1132 (Colo.1984); *In re Title Pertaining to the Sale of Table Wine in Grocery Stores*, 646 P.2d 916, 921 (Colo. 1982).

We conclude that the title and ballot title and submission clause fixed by the Board correctly and fairly represent the true intent and meaning of the proposed measure. Accordingly, we affirm the Board's action

---

5. The repeal would not result in an automatic sales tax increase for cigarettes in home rule municipalities. Imposition of sales taxes is a matter of local determination for these governments pursuant to article XX, § 6, of the Colorado Constitution. *See* §§ 29–2–105, –107, 12A C.R.S. (1986).

6. *Black's Law Dictionary* 506 (5th ed. 1979) defines an excise tax as "[a] tax imposed on the performance of an act, the engaging in an occupation, or the enjoyment of a privilege." It defines a sales tax as a "[t]ax imposed ... on sales of goods ... [that] is a percentage of the purchase price." *Id.* at 1202.

in setting the title and ballot title and submission clause.

## IV.

█ Stealey asserts that the summary prepared by the Board is not clear and concise, that it is not impartial, and that it is misleading. "Unless the summary adopted by the Board is clearly misleading or does not fairly reflect the purport of the proposed amendment, we will not interfere with the Board's choice of language." *In re Title Pertaining to the Proposed Initiative Under the Designation "Tax Reform,"* 797 P.2d 1283, 1288 (Colo.1990). A summary, although obviously more detailed than a title or ballot title and submission clause, "is not intended to fully educate people on all aspects of the proposed law, and it need not set out in detail every aspect of the initiative." *Id.* at 1289; *accord, e.g., In re Title Pertaining to Increase of Taxes on Tobacco Products,* 756 P.2d 995, 998–99 (Colo.1988).

█ Stealey specifically contends that the summary does not explain the delegation of rulemaking authority to the commission or that the funding available to teacher training projects is supplied to only those programs designated by the commission. As discussed above in part III, language explaining the delegation of rulemaking authority to the Board would not appreciably enhance voters' understanding of the proposed measure given the limited nature of the grant of rulemaking authority in this case. Likewise, Stealey's suggested language regarding the limitation on funding of teacher training programs might tend to mislead voters, is not a central feature of the proposal, and was thus properly omitted. *See* part III, above.

We cannot say that these omissions render the summary clearly misleading; therefore we will not interfere with the Board's exercise of discretion on this issue. *See In re Title Pertaining to "Tax Reform,"* 797 P.2d at 1288. We conclude that the summary is clear and concise and constitutes a true and impartial summary of the proposed measure.

## V.

█ Stealey also contends that the fiscal impact statement included in the summary by the Board is inadequate. Stealey argues that the testimony presented by his expert, Dr. Lee, is more accurate than the information provided to the Board by the DLA or the OSPB because only Dr. Lee provided the Board with the specific foundation for his conclusions. In the past we have upheld fiscal impact statements that summarily declared that the fiscal impact of a proposed measure "was indeterminate due to the variables involved and provided no further explanation." *In re Title Pertaining to "Tax Reform,"* 797 P.2d at 1291; *accord, e.g., In re Title Pertaining to Sale of Table Wine in Grocery Stores,* 646 P.2d at 923. We have observed that "a separate explanation of the fiscal impact, although preferable in most cases, is not required when the fiscal impact cannot reasonably be determined from the materials submitted to the Board due to the variables or uncertainties inherent in the particular issue." *In re Title Pertaining to "Tax Reform,"* 797 P.2d at 1291. "Because the fiscal impact of a proposal may be indeterminate or may involve a number of variables that are difficult if not impossible to evaluate, the Board has considerable discretion in exercising its judgment on whether to include in the summary a statement that a proposed measure will have a fiscal impact on government and, if so, how to best communicate that fact without creating prejudice for or against the proposed measure." *In re Title Pertaining to "W.A.T.E.R.,"* 831 P.2d at 1306. The Board's exercise of discretion with respect to the inclusion and content of a fiscal impact statement, however, "is not unlimited and must have some support in the record." *Id.*

The testimony at the March 6 meeting regarding Stealey's motion for a rehearing, together with the reports provided by the OSPB and DLA, establish that the Board was within its discretion to include in the summary a statement that the net fiscal impact of the measure is not known. The record demonstrates that there are a large

number of variables that bear on the number of cigarettes and quantity of tobacco products that will be sold if the measure is adopted. The volume of sales in turn will determine the fiscal impact of the proposed statutory changes on state and local governments. This is explained in the summary in a general way. The interrelationship of the variables that will determine sales volume is extremely complex, and the parties vigorously contest each other's estimates of the impact the measure would have. Given the Board's considerable discretion in the framing of a fiscal impact statement, we decline to reverse the Board's conclusion that the "net effect of [the proposed] changes on state or local government revenues is not known."

### VI.

The proponents of the initiative have requested an award of attorney fees pursuant to C.A.R. 38(d), which permits an appellate court to award costs and damages to an appellee if the court determines that an appeal is frivolous. In response to a request for attorney fees in *In re Title Pertaining to "W.A.T.E.R.,"* 831 P.2d at 1307 n. 1, we noted that section 1–40–102(3)(a), 1B C.R.S. (1991 Supp.), gives to any registered elector "who is not satisfied with the titles, summary, and submission clause [fixed by the Board] and claims them to be unfair or that they do not clearly express the true meaning and intent of the proposed law or constitutional amendment" the right to file a motion for rehearing with the secretary of state, and if overruled by the Board, the right to obtain review in this court. In seeking review by this court, Stealey is merely exercising the statutory privilege granted in section 1–40–102(3)(a). He is a registered elector, and we do not consider his objections to the Board's actions to be frivolous. We therefore decline to award attorney fees to the proponents for defending this appeal.

The ruling of the Board is affirmed.

VOLLACK, J., does not participate.

### APPENDIX

The Colorado Revised Statutes are amended as follows:

Section 1. Title 25, article 1, Colorado Revised Statutes, 1989 Repl.Vol., as amended is amended BY THE ADDITION OF A NEW PART to read:

### PART 12

ALLOCATION OF ADDITIONAL TOBACCO TAX REVENUES BY COLORADO CITIZENS COMMISSION ON TOBACCO AND HEALTH

25–1–1201. LEGISLATIVE DECLARATION. THE PEOPLE OF COLORADO RECOGNIZE THE SIGNIFICANT HEALTH PROBLEMS CREATED BY THE USE OF TOBACCO PRODUCTS AND ARE CONCERNED ABOUT MASSIVE TOBACCO MARKETING AND ADVERTISING, PARTICULARLY THAT AIMED AT YOUNG PEOPLE. THE PEOPLE OF COLORADO FURTHER RECOGNIZE THAT THERE ARE MANY UNINSURED FAMILIES THAT LACK ACCESS TO ADEQUATE HEALTH CARE. THEREFORE, THE PEOPLE OF COLORADO HEREBY DECLARE THAT THE INTENT OF THIS PART 12 IS TO REQUIRE THAT THE COST OF ACQUIRING TOBACCO PRODUCTS MORE NEARLY COVER THE COST OF TREATING THE ILLNESSES THAT THEY CAUSE, TO INITIATE AND FUND A SYSTEM OF EDUCATION AND PREVENTION RELATED TO TOBACCO USE, AND TO HELP RELIEVE THE BURDEN OF PUBLICLY–PROVIDED HEALTH CARE ON TAXPAYERS BY PROVIDING HEALTH CARE FOR THOSE INDIVIDUALS WHO CANNOT AFFORD ADEQUATE HEALTH CARE OR INSURANCE.

25–1–1202. COLORADO CITIZENS COMMISSION ON TOBACCO AND HEALTH. (1) THERE IS HEREBY ESTABLISHED THE COLORADO CITIZENS COMMISSION ON TOBACCO AND HEALTH, REFERRED TO IN THIS PART AS THE COMMISSION. THE COMMISSION SHALL EXERCISE ITS POWERS AND PERFORM ITS DUTIES

AND FUNCTIONS AS IF TRANSFERRED TO THE DEPARTMENT OF HEALTH BY A TYPE 1 TRANSFER. THE COMMISSION SHALL CONSIST OF SEVEN MEMBERS, SIX OF WHOM SHALL EACH RESIDE IN A DIFFERENT CONGRESSIONAL DISTRICT. NO MORE THAN FOUR MEMBERS SHALL BE FROM THE SAME POLITICAL PARTY. THE MEMBERS SHALL BE APPOINTED BY THE GOVERNOR, AND THEIR APPOINTMENTS SHALL BE CONFIRMED BY THE SENATE. ALL MEMBERS OF THE COMMISSION SHALL SERVE A TERM OF THREE YEARS; EXCEPT THAT, OF THOSE FIRST APPOINTED, TWO SHALL SERVE A TERM OF ONE YEAR, TWO SHALL SERVE A TERM OF TWO YEARS, AND THREE SHALL SERVE A TERM OF THREE YEARS. ALL INITIAL APPOINTMENTS SHALL BE COMPLETED BY JULY 1, 1993. ONE OF THE MEMBERS SHALL BE SELECTED BY THE COMMISSION TO SERVE AS ITS CHAIR. THE COMMISSION SHALL BE COMPOSED OF INDIVIDUALS WITH INTEREST AND BACKGROUND IN TOBACCO RELATED HEALTH PROBLEMS, EDUCATION, AND PROVISION OF HEALTH CARE. COMMISSION MEMBERS SHALL NOT BE COMPENSATED FOR THEIR SERVICE, BUT THEIR EXPENSES AND THE SALARIES AND EXPENSES OF STAFF MEMBERS SHALL BE PAID FROM THE REVENUES ALLOCATED UNDER SUBSECTION (3)(d).

(2) THE COMMISSION SHALL HAVE THE FOLLOWING POWERS: (a) TO DEVELOP GUIDELINES FOR ALLOCATION AND DISTRIBUTION OF THE REVENUES APPROPRIATED TO THE DEPARTMENT OF HEALTH UNDER SECTIONS 39–28–103(2) AND 39–28.5–102(2); (b) TO DETERMINE IN CONFORMITY WITH SUBSECTION (3) THE ALLOCATION OF REVENUES APPROPRIATED TO THE DEPARTMENT OF HEALTH UNDER SECTIONS 39–28–103(2) AND 39–28.5–102(2) AMONG PROGRAMS TO AID THE MEDICALLY UNINSURED AND THOSE PERSONS WHO DO NOT QUALIFY FOR OR WHO CANNOT AFFORD HEALTH INSURANCE OR ADEQUATE HEALTH CARE, PROGRAMS FOR EDUCATION, AND PROGRAMS FOR PREVENTATIVE HEALTH CARE AND RESEARCH; (c) TO ESTABLISH EVALUATION CRITERIA FOR PROGRAMS FUNDED AND TO EVALUATE THE PROGRAMS; AND (d) ANNUALLY TO AUDIT THE EXPENDITURES OF REVENUE APPROPRIATED TO THE DEPARTMENT OF HEALTH UNDER SECTIONS 39–28–103(2) AND 39–28.5–102(2) AND TO REPORT TO THE GOVERNOR AND THE GENERAL ASSEMBLY ON THE EXPENDITURE OF THE REVENUES.

(3) THE REVENUES APPROPRIATED TO THE DEPARTMENT OF HEALTH UNDER SECTIONS 39–28–103(2) AND 39–28.5–102(2) SHALL BE EXPENDED AS FOLLOWS: (a) NOT LESS THAN FIFTY PERCENT TO PROGRAMS FOR PEOPLE WHO DO NOT QUALIFY FOR OR CANNOT AFFORD HEALTH INSURANCE OR TO PROGRAMS TO PROVIDE HEALTH CARE FOR THE MEDICALLY INDIGENT; (b) UP TO TWENTY FIVE PERCENT FOR RESEARCH AND EDUCATION ABOUT AND PREVENTION OF TOBACCO–RELATED ILLNESS, INCLUDING CESSATION OF SMOKING; (c) NOT MORE THAN ONE PERCENT FOR THE COSTS OF ADMINISTRATION OF THE COMMISSION'S ACTIVITIES; AND (d) THE REMAINDER TO TEACHER TRAINING PROJECTS DESIGNATED BY THE COMMISSION. ANY REVENUES NOT ALLOCATED BY THE COMMISSION SHALL REVERT TO THE GENERAL FUND.

(4) PROGRAMS THAT PROVIDE HEALTH CARE FOR THE MEDICALLY INDIGENT INCLUDE INPATIENT HOSPITAL SERVICES, OUTPATIENT PRIMARY CARE PROVIDED BY BOTH HOSPITALS AND COMMUNITY CLINICS AND OTHER ALTERNATIVE FORMS OF INTERMEDIATE HEALTH CARE, INCLUDING HOSPICE AND NURSING HOME CARE NOT TO EXCEED THREE MONTHS. REIMBURSEMENT RATES MAY NOT DISCRIMI

NATE AMONG PROVIDERS BASED ON WHETHER THEY ARE IN RURAL OR METRO AREAS. IN CONTRACTING FOR THE USE OF THESE FUNDS, THE COMMISSION' SHALL CONSIDER THE NUMBER OF MEDICALLY INDIGENT SERVED AND THE PROPORTION OF THE TOTAL MEDICAL INDIGENT CARE PROVIDED IN THE STATE AND THE COST, QUALITY AND EFFICIEN-CY OF SERVICE. THE FUNDS PRO-VIDED PURSUANT TO THIS PARA-GRAPH (a) OF SUBSECTION 3 OF THIS SECTION SHALL BE IN ADDITION TO THE FUNDS ALLOCATED FOR PRO-GRAMS FOR THE MEDICALLY INDI-GENT ESTABLISHED AND ADMINIS-TERED BY STATE LAW, ARTICLE 15 OF TITLE 26, C.R.S. IT IS THE INTEN-TION OF THE PEOPLE OF THE STATE THAT THE GENERAL ASSEMBLY SHALL NOT REDUCE THE LEVEL OF FUNDING FOR SUCH PREEXISTING MEDICALLY INDIGENT PROGRAMS BELOW THE LEVEL PROVIDED IN THE STATE FISCAL YEAR 1988–1989 UNDER ARTICLE 15 OF TITLE 26, C.R.S., WITH THE APPROPRIATE AN-NUAL INFLATIONARY ADJUSTMENTS AS DETERMINED BY THE GENERAL ASSEMBLY.

(5) THE COMMISSION SHALL BE AU-THORIZED TO ISSUE RULES AND REG-ULATIONS IN ACCORDANCE WITH SECTION 24-4-101 ET SEQ. TO CARRY OUT THE PURPOSES OF THIS PART 12.

Section 2. 24-1-119, Colorado Revised Statutes, 1988 Repl.Vol., as amended, is amended BY THE ADDITION OF A NEW SUBSECTION to read:

(8) THE COLORADO CITIZENS COM-MISSION ON TOBACCO AND HEALTH, CREATED BY PART 12 OF ARTICLE 1 OF TITLE 25, C.R.S., SHALL EXERCISE ITS POWERS AND PERFORM ITS DUTIES AND FUNCTIONS AS IF THE SAME WERE TRANSFERRED BY A TYPE 1 TRANSFER TO THE DEPART-MENT OF HEALTH.

Section 3. 39-22-623, Colorado Revised Statutes, 1982 Repl.Vol., as amended, is amended to read:

(1)(a)(II) Effective July 1, 1987, an amount equal to twenty-seven percent of the gross state cigarette tax shall be appor-tioned to incorporated cities and incorporat-ed towns which levy taxes and adopt for-mal budgets and to counties. FOR THE PURPOSES OF THE DISTRIBUTION OF REVENUES PURSUANT TO THIS SUB-SECTION, THE GROSS STATE CIGA-RETTE TAX SHALL NOT INCLUDE THE ADDITIONAL TAXES IMPOSED PURSU-ANT TO SECTIONS 39–28–103(2) AND 39-28.5-102(2). IN ORDER TO HOLD MUNICIPALITIES AND COUNTIES EN-TITLED TO RECEIVE REVENUES PUR-SUANT TO THIS SUBSECTION HARM-LESS FROM ANY REVENUE LOSS OC-CURRING AFTER THE IMPOSITION OF SUCH ADDITIONAL TAXES, THE AGGREGATE AMOUNT DISTRIBUTED TO SUCH MUNICIPALITIES AND COUNTIES IN EACH FISCAL YEAR SHALL NOT BE LESS THAN THE AGGREGATE AMOUNT OF REVENUES DISTRIBUTED TO SUCH MUNICIPALI-TIES AND COUNTIES IN THE FISCAL YEAR ENDING JUNE 30, 1991. For the purposes of this section, a city and county shall be considered as a city. The city or town share shall be apportioned according to the percentage of state sales tax reve-nues collected by the department of reve-nue in an incorporated city or town as compared to the total state sales tax collec-tions that may be allocated to all political subdivisions in the state; the county share shall be the same as that which the per-centage of state sales tax revenues collect-ed in the unincorporated area of the county bears to total state sales tax revenues which may be allocated to all political sub-divisions in the state. The department of revenue shall certify to the state treasurer, at least annually, the percentage for alloca-tion to each city, town, and county, and such percentage for allocation so certified shall be applied by said department in all distributions to cities, towns, and counties until changed by certification to the state treasurer. In order to qualify for distribu-tions of state income tax moneys, units of

local government are prohibited from imposing fees, licenses, or taxes on any person as a condition for engaging in the business of selling cigarettes or from attempting in any manner to impose a tax on cigarettes OTHER THAN A SALES OR USE TAX. For purposes of this paragraph (a), the "gross state cigarette tax" means the total tax before the discount provided for in section 39-28-104(1).

Section 4. 39-26-114(1)(a)(iv), Colorado Revised Statutes, 1982 Repl.Vol., is repealed.

Section 5. 39-26-203(1)(j), Colorado Revised Statutes, 1982 Repl.Vol., is repealed.

Section 6. 39-28-103, Colorado Revised Statutes, 1982 Repl.Vol., is amended BY THE ADDITION OF A NEW SUBSECTION to read:

(2) NOTWITHSTANDING THE TEN MILL RATE PROVISIONS OF SUBSECTION (1) OF THIS SECTION, THE RATE IMPOSED PURSUANT TO THIS SECTION SHALL BE INCREASED BY SEVENTEEN AND ONE HALF MILLS ON EACH CIGARETTE. THE RATE OF TAX IMPOSED PURSUANT TO THIS SUBSECTION (2) SHALL BE ADJUSTED BY THE DEPARTMENT OF REVENUE EACH JULY 1 TO REFLECT INCREASES IN THE MEDICAL CARE COMPONENT OF THE REGIONAL CONSUMER PRICE INDEX FOR THE REGION INCLUDING COLORADO. AN AMOUNT OF GENERAL FUND MONIES EQUAL TO THE GROSS REVENUES DERIVED FROM THE ADDITIONAL SEVENTEEN AND ONE HALF MILLS IMPOSED ON CIGARETTES PLUS ANY ANNUAL ADJUSTMENTS AS DESCRIBED IN THIS SUBSECTION SHALL BE AVAILABLE AND APPROPRIATED FROM THE GENERAL FUND TO THE DEPARTMENT OF HEALTH TO BE DISTRIBUTED ACCORDING TO THE ALLOCATION FORMULA IN SECTION 25-1-1202(3).

Section 7. 39-28.5-102, Colorado Revised Statutes, 1982 Repl.Vol., as amended, is amended BY THE ADDITION OF A NEW SUBSECTION to read:

(2) NOTWITHSTANDING THE RATE OF TWENTY PERCENT IN SUBSEC-

TION (1) OF THIS SECTION, THE RATE OF TAX ON ALL OTHER TOBACCO PRODUCTS IMPOSED PURSUANT TO THIS SECTION SHALL BE INCREASED TO FIFTY FIVE PERCENT OF THE MANUFACTURER'S LIST PRICE OF SUCH TOBACCO PRODUCTS. THE RATE OF TAX IMPOSED PURSUANT TO THIS SUBSECTION (2) SHALL BE ADJUSTED BY THE DEPARTMENT OF REVENUE EACH JULY 1 TO REFLECT INCREASES IN THE MEDICAL CARE COMPONENT OF THE REGIONAL CONSUMER PRICE INDEX FOR THE REGION INCLUDING COLORADO. AN AMOUNT OF GENERAL FUND MONIES EQUAL TO THE GROSS REVENUES DERIVED FROM THE ADDITIONAL PERCENTAGE TAX IMPOSED ON TOBACCO PRODUCTS PLUS ANY ANNUAL ADJUSTMENTS AS DESCRIBED IN THIS SUBSECTION SHALL BE AVAILABLE AND APPROPRIATED FROM THE GENERAL FUND TO THE DEPARTMENT OF HEALTH TO BE DISTRIBUTED ACCORDING TO THE ALLOCATION FORMULA IN SECTION 25-1-1202(3).

Section 8. This initiated measure shall take effect April 1, 1993.