## In the Matter of the Title, Ballot Title and Submission Clause, and Summary Pertaining to the PROPOSED INITIATIVE ON SCHOOL PILOT PROGRAM.

### Dan MORRIS, Petitioner,

and

### Steve Durham and Ron Pierce, Respondents,

and

### Natalie Meyer, Stephen ErkenBrack, and Rebecca Lennahan, Title Setting Board.

### No. 94SA97.

Supreme Court of Colorado,
En Banc.

May 23, 1994.

Martha R. Houser, Gregory J. Lawler, Sharyn E. Dreyer, Cathy L. Cooper, Bradley C. Bartels, Aurora, for petitioner.

Berry & Singer, John Berry, Denver, for respondents.

Gale A. Norton, Atty. Gen., Stephen K. ErkenBrack, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Maurice G. Knaizer, Deputy Atty. Gen., Denver, for Title Setting Bd.

Justice KIRSHBAUM delivered the Opinion of the Court.

Petitioner Dan Morris (Morris), a registered elector of the State of Colorado, has filed this challenge to the title, ballot title and submission clause, and summary prepared by the Initiative Title Setting Board (the Board) for a proposed initiated amendment to the Colorado Constitution relating to the education of elementary and secondary school students. We affirm the Board.

The proposed amendment would require the General Assembly to establish one or more pilot programs to demonstrate the viability of parental choice in education by providing grants of aid to children through their parents. Such programs must be designed to ensure that the amount the state would otherwise spend on education under the school finance act as it exists on January 1, 1995, would not be increased and that the amount of per-pupil funding for public school students may not be decreased. The initiative authorizes the General Assembly to require schools selected for any pilot program to meet academic standards that measure students' cognitive development; provides that at least ten percent of the total state elementary and secondary school population shall be eligible to participate in the pilot programs in the 1995–96 school year and that the minimum percentage of participating students shall increase by at least five percent per year until the year 2001; and requires any program established by the General Assembly after the year 2001 to be available to all elementary and secondary school students in the state.

The proposal contains a provision prohibiting expenditures of funds to purchase educational services from institutions operated, controlled or funded by organizations that are formed for political purposes; that teach hatred of any person or group on the basis of race, ethnicity, color, national origin, religion, or gender; or that discriminate on the basis of race, ethnicity, color, or national origin. The proposal requires the General Assembly to review all established pilot programs in

January 2001; authorizes the General Assembly to repeal any program it deems ineffective at that time; and provides that the proposed amendment shall not be construed to allow or encourage the state to regulate any private delivery system beyond the scope of such regulatory authority existing on January 1, 1994. The text of the proposed amendment is attached hereto as APPENDIX A. The text of the title, ballot title and submission clause, and summary as prepared by the Board are attached hereto as APPENDIX B.

Morris contends that the title and the ballot title and submission clause do not fully and fairly express the intent of the proposal, and that a statement contained in the summary that the fiscal impact of the proposed initiative is indeterminate is inaccurate and misleading. We reject these arguments.

## I

The proponents of the proposed amendment, Steve Durham and Ron Pierce, submitted an original typewritten draft thereof to the Office of Legislative Legal Services and to the Legislative Council, pursuant to section 1–40–105(1), 1B C.R.S. (1993 Supp.). After comments were received and a public hearing on the comments was held, the proponents submitted the measure to the Board. On February 16, 1994, the Board fixed a title, a ballot title and submission clause, and a summary for the proposed amendment. On February 23, 1994, pursuant to section 1–40–107(1), 1B C.R.S. (1993 Supp.), Morris filed a motion for rehearing, which motion was denied by the Board on March 2, 1994. Morris then filed this challenge to the Board's action.

## II

Morris contends that the title and the ballot title and submission clause are misleading and fail to fully and fairly express the intent of the proposed amendment because they contain no reference to subsection (6) thereof and because they state, without reservation, that the General Assembly has the authority to repeal any ineffective program. He also contends that the summary prepared by the Board is misleading because the fiscal impact of the proposed initiative can be determined and that the Board's failure to include any explanation of why the fiscal impact of the proposal is indeterminate will mislead voters and is unfair. We will consider each of these arguments.

## A

■ The right to initiate constitutional amendments is reserved to the registered electors of the state by article V, section 1, of the Colorado Constitution. To aid the electors in the exercise of this right, the Board is directed to designate and fix a title, a ballot title and submission clause, and a summary for initiated petitions before they are signed by electors. *See Brownlow v. Wunsch,* 103 Colo. 120, 131, 83 P.2d 775, 780 (1938). In performing these statutory responsibilities, the Board need not describe every feature of a proposed measure. *In re Proposed Initiated Constitutional Amendment Concerning Limited Gaming in the City of Antonito (Limited Gaming IV),* 873 P.2d 733, 739 (Colo.1994); *In re Initiated Constitutional Amendment Concerning Limited Gaming in Burlington,* 830 P.2d 1023, 1026 (Colo.1992). The title, by definition, is to be "a brief statement that fairly and accurately represents the true intent and meaning of the proposed text of the initiative." § 1–40–102(10), 1B C.R.S. (1993 Supp.); *see also* § 1–40–106(3)(b), 1B C.R.S. (1993 Supp.). The Board also "shall consider the public confusion that might be caused by misleading titles and shall, whenever practicable, avoid titles for which the general understanding of the effect of a 'yes' or 'no' vote will be unclear." § 1–40–106(3)(b), 1B C.R.S. (1993 Supp.). The General Assembly has adopted the following pertinent provisions:

Ballot titles shall be brief, shall not conflict with those selected for any petition previously filed for the same election, and shall be in the form of a question which may be answered "yes" (to vote in favor of the proposed law or constitutional amendment) or "no" (to vote against the proposed law or constitutional amendment) and which shall unambiguously state the principle of

the provision sought to be added, amended, or repealed.

*Id.* We have recognized that "[t]he purpose of the title setting process is to ensure that both [the] persons reviewing an initiated petition and the voters are fairly and succinctly advised of the import of the proposed law." *In re Proposed Tobacco Tax Amendment 1994,* 872 P.2d 689, 693 (Colo.1994); *In re Proposed Initiative on Education Tax Refund,* 823 P.2d 1353, 1355 (Colo.1991).

 If a proponent of an initiated measure or any registered elector believes a title, ballot title and submission clause, or summary ·fixed by the Board does not fairly express the true meaning or intent of a proposed initiative, that person may file a motion for rehearing with the Board and if the motion is denied, is entitled to request review of the Board's action by this court.[1] In *Bauch v. Anderson,* 178 Colo. 308, 310, 497 P.2d 698, 699 (1972), we noted the limited scope of our review of the Board's exercise of its constitutional responsibilities as follows:

> (1) [W]e must not in any way concern ourselves with the merit or lack of merit of the proposed amendment since, under our system of government, that resolution rests with the electorate; (2) all legitimate presumptions must be indulged in favor of the propriety of the board's actions; and (3) only in a clear case should a title prepared by the board be held invalid.

Our duty is to ensure that the title, ballot title and submission clause, and summary fairly reflect the proposed initiative so that petition signers and voters will not be misled into support for or against a proposition by reason of the words employed by the Board. *In re Workers Comp. Initiative,* 850 P.2d 144, 146 (Colo.1993); *In re Initiated Constitutional Amendment Concerning Limited Gaming in Burlington,* 830 P.2d at 1026. In reviewing the documents prepared by the Board, we are "not to write the best possible ballot title but simply to eliminate a title which is insufficient or unfair." *In re Election Reform Amendment,* 852 P.2d 28, 35 (Colo.1993).

**B**

 Morris first argues that the title and the ballot title and submission clause are unfairly misleading because they do not contain any reference to subsection (6) of the proposed amendment. We disagree.

 Subsection (6) of the proposed amendment provides as follows:

> (6) NO FUNDS MAY BE EXPENDED UNDER A PILOT PROGRAM ESTABLISHED PURSUANT TO THIS SECTION TO PURCHASE EDUCATIONAL SERVICES FROM ANY INSTITUTION OPERATED, CONTROLLED, OR FUNDED BY ANY ORGANIZATION FORMED FOR POLITICAL PURPOSES, AS DEFINED BY LAW, FROM ANY INSTITUTION THAT TEACHES HATRED OF ANY PERSON OR GROUP ON THE BASIS OF RACE, ETHNICITY, COLOR, NATIONAL ORIGIN, RELIGION, OR GENDER, OR FROM ANY INSTITUTION THAT DISCRIMINATES ON THE BASIS OF RACE, ETHNICITY, COLOR, OR NATIONAL ORIGIN.

Morris argues that this subsection implicitly authorizes the use of state funds by parents to purchase educational services that in fact discriminate on the basis of religion, disability, gender, and sexual orientation. This argument is based on Morris' particular construction of the language of the proposed amendment. However, the language of subsection (6) may also be interpreted in other ways. Neither the Board, when it sets titles, ballot titles and submission clauses, and summaries, nor this court, when it sits in review of the Board's determinations, is authorized to interpret the meaning or potential effects of proposed initiatives. *See In re Proposed Initiative on Surface Mining,* 797 P.2d 1275, 1279 (Colo.1990).

Morris in effect concedes that subsection (6) does not expressly authorize such discrimination, and he does not assert that the proponents of the initiative intended to au-

---

**1.** The filing of such motion is a prerequisite to this court's exercise of jurisdiction. § 1–40–107(2), 1B C.R.S. (1993 Supp.). *See In re Election Reform Amendment,* 852 P.2d 28, 33 (Colo. 1993).

thorize departures from state or federal prohibitions against discriminatory practices by state institutions.[2] For example, Morris cites to article IX, section 7, of the Colorado Constitution, which prohibits the General Assembly from paying monies from public funds for any sectarian program or to help support any school controlled by a church or sectarian denomination. As we have indicated, it is not our province in this statutory review proceeding to address the possible interaction between the proposed amendment and any current or future provision of the Colorado Constitution. *In re Proposed Initiative on Surface Mining*, 797 P.2d at 1279.

■ The Board need not and often cannot describe every feature of a proposed initiative in a title or ballot title and submission clause and simultaneously heed the mandate that such documents be concise. *In re Election Reform Amendment*, 852 P.2d at 32–33. On the other hand, the Board may not sacrifice a full and fair description of essential features of a proposal on the altar of brevity. *Id.* In the summary it prepared, the Board describes the provisions of subsection (6) of the proposed amendment. The Board's election not to do so in the title and the ballot title and submission clause no doubt reflects its decision that subsection (6) is not an essential element of the proposal. We find no abuse of discretion in the Board's election, and conclude that the title and the ballot title and submission clause are not unfair or misleading.

C

■ Morris next contends that the title and the ballot title and submission clause are unfair and misleading because they fail to state that neither review nor repeal of pilot programs can occur prior to the year 2001.

2. Any judicial interpretation of the meaning of the initiative must await an adjudication in a specific factual context. *In re Casino Gaming Initiative*, 649 P.2d 303, 310 (Colo.1982). It is noteworthy that in their brief the respondents state that at the public hearing for the proposed amendment the proponents indicated that subsection (6) was not intended to authorize violations of state or federal constitutional protections against discriminatory practices. The transcript

Subsection (2)(b) of the proposed amendment states as follows:

(b) THE GENERAL ASSEMBLY SHALL REVIEW THE PILOT PROGRAMS ESTABLISHED PURSUANT TO THIS SECTION IN JANUARY, 2001, AND MAY REPEAL ANY SUCH PROGRAM WHICH IT DEEMS IS NOT EFFECTIVE.

Morris suggests that the language of this subsection prohibits the General Assembly from reviewing or repealing ineffective programs prior to 2001. However, Morris' proposed construction is not the only reasonable interpretation of the proposed provision.[3] Morris again presents an argument based on his interpretation of the language of the proposed amendment. As we have indicated, construction of the language of a proposed initiative is beyond the scope of a statutory review proceeding. *In re Proposed Initiative on Surface Mining*, 797 P.2d 1275, 1279 (Colo.1990). While the Board could have elected to include language in the title and the ballot title and submission clause summarizing the precise language of subsection (2)(b) of the proposed amendment, its decision not to do so does not render the documents unfair or misleading. The Board is required to reference only essential features of a proposed initiative in drafting titles and ballot titles and submission clauses, not all features thereof. *See In re Proposed Initiated Constitutional Amendment Concerning Limited Gaming in the City of Antonito (Limited Gaming IV)*, 873 P.2d 733, 739 (Colo.1994); *In re Initiated Constitutional Amendment Concerning Limited Gaming in Burlington*, 830 P.2d 1023, 1026 (Colo.1992). We reject Morris' argument.

D

■ In addition to fixing a title and a ballot title and submission clause, the Board

of that hearing is not included in the record on appeal.

3. The proponents note in their brief that at the review and comment public hearing, they stated that their intent was to allow the General Assembly to repeal any ineffective program at any time after the school pilot program was implemented.

has a statutory duty to "prepare a clear, concise summary of the proposed law or constitutional amendment [which] summary shall be true and impartial and shall not be an argument, nor likely to create prejudice, either for or against the measure." § 1–40–106(3)(a), 1B C.R.S. (1993 Supp.). If the Board determines that a proposed initiative will have a fiscal impact on the state or any of its political subdivisions, the Board shall request assistance from the Office of State Planning and Budgeting or the Department of Local Affairs in such matter. *Id.* The summary must include an estimate of any such fiscal impact and an explanation of the estimate. *Id.*

Morris contends that the statement contained in the summary prepared by the Board that the fiscal impact of the proposed amendment is indeterminate is misleading because if certain assumptions are made, the fiscal impact of the proposal can be determined.[4] Such assumptions represent Morris' interpretation of how the measure would be implemented.[5] Neither the Board, in preparing the title, ballot title and submission clause, and summary, nor this court, sitting in review of the Board's actions, can interpret the effects of a proposed initiative. *In re Proposed Initiative Concerning "State Personnel System"*, 691 P.2d 1121, 1125 (Colo.1984); *In re Casino Gaming Initiative,* 649 P.2d 303, 310 (Colo.1982).

 Furthermore, the proposed amendment provides that any pilot program must be designed in such manner as to not increase the amount the state would otherwise expend on education and at the same time to not decrease the amount of per-pupil funding for public school students. When variables render an opinion with respect to the fiscal impact of a proposed initiative uncertain and the Board cannot determine the fiscal impact thereof from the materials submitted to it, the Board need not provide a definitive statement of fiscal impact in its summary of the proposal. *In re Election Reform Amendment,* 852 P.2d 28, 37 (Colo.1993); *In re Proposed Initiated Constitutional Amendment Concerning Unsafe Workplace Environment,* 830 P.2d 1031, 1035 (Colo.1992). Here, the total fiscal effect of pilot programs will depend on innumerable interrelationships among diverse programs, rendering the calculation of economic impact extremely complex. In view of these circumstances, we conclude that the Board's determination that the fiscal impact of the proposed amendment is indeterminate is justified. *See In re Proposed Initiated Constitutional Amendment of Education, 1984,* 682 P.2d 480, 483 (Colo. 1984).

 Morris argues in the alternative that the Board's failure to explain its one-sentence statement of fiscal impact is misleading. We disagree.

In *In re Proposed Tobacco Tax,* 830 P.2d 984, 991–92 (Colo.1992), we upheld a fiscal impact statement that summarily declared that the fiscal impact of a proposed initiative was indeterminate because of the variables involved. We concluded that such statement was not inappropriate if the record contained support for the Board's determination. *Id.*

---

**4.** Morris suggests that there are approximately 675,000 school-age children in the state, including public school, non-public school, and home-schooled children, and that the number of students eligible for participation in pilot programs established pursuant to the proposed amendment would be in the same proportion as such groups now relate to the general population of school-age children (i.e., eight percent from private and home schools). On the basis of those assumptions, and recognizing that under the proposed amendment the total amount of per-pupil funding should not change significantly, Morris calculates the minimum fiscal impact in 1995–96 to be $4,100 per student times 5,400 students, or $22,140,000. If all private and home-school children were to participate, the fiscal impact would be $4,100 per student times 50,000 students, or $205,000,000. In 1996–97, under these same assumptions, the range of the fiscal impact would be $32,800,000 to $205,000,000.

**5.** The Board, in its brief, states that the Department of Local Affairs saw no direct fiscal impact on local governments other than school districts, while the Office of State Planning and Budgeting projected potential impacts for the years 1995–96 and 1996–97, based on its assumptions. The Board states that the figures for the 1996–97 school year given by the Office of State Planning and Budgeting differ from those projected by Morris. The actual responses to the Board's request for assistance from these agencies are not included in the record to this court, nor were they appended to any of the briefs.

Relying upon statutory language requiring an explanation of the statement of fiscal impact,[6] Morris argues that at a minimum the Board should be required to state that a calculation of any fiscal impact is impossible because of the presence of variables and provide an example of such variables. We have recognized that when the elements of a proposed initiative have particular fiscal impacts, some or all of which are determinable, but which are indeterminate in the aggregate, the Board's summary should state the fiscal impact of each distinct provision of the proposal. *In re Election Reform Amendment*, 852 P.2d at 37. *See also In re Proposed Tobacco Tax Amendment 1994*, 872 P.2d 689, 696–97 (Colo.1994). We have also recognized the adequacy of a fiscal impact statement to the effect that while there would be some impact, the magnitude thereof was uncertain. *In re Workers Comp. Initiative*, 850 P.2d 144, 148 (Colo.1993).

In this case, the Board's statement that the fiscal impact is indeterminate in effect recognizes that the existence of numerous variables frustrates any effort to establish such impact. In view of the limited record before this court, which does not contain transcripts of the proceedings before the Board or the responses received by the Board from the Department of Local Affairs or the Office of State Planning and Budgeting, we conclude that the Board's failure to explain why the fiscal impact of the proposed amendment is indeterminate substantially complies with its statutory responsibilities.

### III

In summary, we conclude that the Board's failure to refer to subsection (6) of the proposed amendment in the title and the ballot title and submission clause, or to mention therein the fact that the measure provides that pilot programs shall be reviewed or repealed by the General Assembly in the year 2001 does not render those documents unfair or misleading. We also conclude that the statement in the summary that the fiscal

impact is indeterminate is adequate. Accordingly, we affirm the ruling of the Board.

### APPENDIX A

Be it Enacted by the People of the State of Colorado:

Article IX of the constitution of the state of Colorado is amended BY THE ADDITION OF A NEW SECTION to read:

Section 17. Parental choice in education—pilot programs.

(1) THE PEOPLE OF COLORADO, DESIRING TO IMPROVE THE QUALITY OF EDUCATION AVAILABLE TO ALL CHILDREN AND TO ASSURE EQUAL ACCESS TO EDUCATIONAL OPPORTUNITIES, ADOPT THIS SECTION TO ESTABLISH ONE OR MORE PILOT PROGRAMS TO DEMONSTRATE THE VIABILITY OF PARENTAL CHOICE IN EDUCATION AS A MECHANISM TO INCREASE THE QUALITY OF LEARNING IN COLORADO'S SCHOOLS. ANY FUNDS EXPENDED HEREWITH ARE GRANTS OF AID TO CHILDREN THROUGH THEIR PARENTS AND NOT TO SCHOOLS IN WHICH SUCH CHILDREN ARE ENROLLED.

(2)(a) NOTWITHSTANDING ANY PROVISIONS OF SECTION 7 OF THIS ARTICLE, SECTION 34 OF ARTICLE V, OR SECTION 2 OF ARTICLE XI OF THE STATE CONSTITUTION TO THE CONTRARY, THE GENERAL ASSEMBLY SHALL BY LAW ESTABLISH ONE OR MORE PILOT PROGRAMS, TO TAKE EFFECT BEGINNING WITH THE 1995–1996 SCHOOL YEAR, TO DEMONSTRATE THE EFFICACY OF SCHOOL CHOICE AS AN EDUCATION OPTION.

(b) THE GENERAL ASSEMBLY SHALL REVIEW THE PILOT PROGRAMS ESTABLISHED PURSUANT TO THIS SECTION IN JANUARY, 2001, AND MAY REPEAL ANY SUCH PROGRAM WHICH IT DEEMS IS NOT EFFECTIVE.

---

**6.** Section 1–40–106(3)(a), 1B C.R.S. (1993 Supp.), provides in pertinent part as follows: "[T]he summary shall include an estimate of any such fiscal impact, together with an explanation thereof."

(3) IN ESTABLISHING ANY PILOT PROGRAM PURSUANT TO THIS SECTION, THE GENERAL ASSEMBLY SHALL DESIGN SUCH PROGRAM TO BE A VALID TEST OF SCHOOL CHOICE AS A MECHANISM TO EMPOWER THE GREATEST NUMBER OF PARENTS TO SELECT FROM THE BROADEST ARRAY OF QUALITY EDUCATIONAL OPTIONS FOR THEIR CHILDREN, WHILE NOT INCREASING THE AMOUNT THE STATE WOULD OTHERWISE EXPEND ON EDUCATION UNDER THE SCHOOL FINANCE ACT AS IT EXISTS ON JANUARY 1, 1995, OR AS AMENDED. IN ADDITION, THE AMOUNT OF PER PUPIL FUNDING FOR PUBLIC SCHOOL STUDENTS MAY NOT BE DECREASED AS A RESULT OF ANY PILOT PROGRAM ESTABLISHED PURSUANT TO THIS SECTION.

(4) AS A PREREQUISITE FOR PARTICIPATION IN ANY PILOT PROGRAM ESTABLISHED PURSUANT TO THIS SECTION, THE GENERAL ASSEMBLY MAY REQUIRE ANY SCHOOL THAT PARTICIPATES IN SUCH PILOT PROGRAM TO MEET CERTAIN ACADEMIC STANDARDS THAT MEASURE A STUDENT'S COGNITIVE DEVELOPMENT.

(5) FOR THE 1995–1996 SCHOOL YEAR, A MINIMUM OF TEN PERCENT OF THE TOTAL ELEMENTARY AND SECONDARY SCHOOL POPULATION OF THE STATE SHALL BE ELIGIBLE TO PARTICIPATE IN THE PILOT PROGRAMS ESTABLISHED PURSUANT TO THIS SECTION. THE MINIMUM PERCENTAGE OF ELIGIBLE STUDENTS SHALL INCREASE BY AT LEAST FIVE PERCENT PER YEAR UNTIL 2001. ANY PROGRAM FOR SCHOOL CHOICE ESTABLISHED BY THE GENERAL ASSEMBLY AFTER 2001 SHALL BE AVAILABLE TO ALL ELEMENTARY AND SECONDARY SCHOOL STUDENTS IN THE STATE.

(6) NO FUNDS MAY BE EXPENDED UNDER A PILOT PROGRAM ESTABLISHED PURSUANT TO THIS SECTION TO PURCHASE EDUCATIONAL SERVICES FROM ANY INSTITUTION OPERATED, CONTROLLED, OR FUNDED BY ANY ORGANIZATION FORMED FOR POLITICAL PURPOSES, AS DEFINED BY LAW, FROM ANY INSTITUTION THAT TEACHES HATRED OF ANY PERSON OR GROUP ON THE BASIS OF RACE, ETHNICITY, COLOR, NATIONAL ORIGIN, RELIGION, OR GENDER, OR FROM ANY INSTITUTION THAT DISCRIMINATES ON THE BASIS OF RACE, ETHNICITY, COLOR, OR NATIONAL ORIGIN.

(7) NO PROVISION OF THIS SECTION SHALL BE CONSTRUED TO ALLOW OR ENCOURAGE THE STATE, OR ANY SUBDIVISION THEREOF, TO REGULATE ANY PRIVATE EDUCATIONAL DELIVERY SYSTEM BEYOND THE POWER THAT EXISTS AS OF JANUARY 1, 1994.

## APPENDIX B

Proposed Initiative on School Pilot Program

The title as designated and fixed by the Board is as follows:

AN AMENDMENT TO THE COLORADO CONSTITUTION REQUIRING THE GENERAL ASSEMBLY TO ESTABLISH ONE OR MORE PILOT PROGRAMS TO DEMONSTRATE THE VIABILITY OF PARENTAL CHOICE IN EDUCATION; SPECIFYING THAT ANY FUNDS EXPENDED UNDER THE MEASURE ARE GRANTS OF AID TO CHILDREN THROUGH THEIR PARENTS; ESTABLISHING THE PERCENTAGE OF ELEMENTARY AND SECONDARY SCHOOL STUDENTS WHO WILL BE ELIGIBLE TO PARTICIPATE IN PILOT PROGRAMS; PERMITTING THE GENERAL ASSEMBLY TO REPEAL ANY INEFFECTIVE PROGRAM; SPECIFYING THAT AFTER 2001, ANY PROGRAM FOR SCHOOL CHOICE ESTABLISHED BY THE GENERAL ASSEMBLY MUST BE MADE AVAILABLE TO ALL ELEMENTARY AND SECONDARY SCHOOL STUDENTS IN THE STATE; AND PROHIBITING ANY DECREASE IN PER PUPIL FUNDING FOR PUBLIC SCHOOL STU-

DENTS AS A RESULT OF IMPLEMENTING PILOT PROGRAMS WHILE NOT INCREASING THE AMOUNT THE STATE WOULD OTHERWISE EXPEND ON EDUCATION.

The ballot title and submission clause as designated and fixed by the Board is as follows:

SHALL THERE BE AN AMENDMENT TO THE COLORADO CONSTITUTION REQUIRING THE GENERAL ASSEMBLY TO ESTABLISH ONE OR MORE PILOT PROGRAMS TO DEMONSTRATE THE VIABILITY OF PARENTAL CHOICE IN EDUCATION; SPECIFYING THAT ANY FUNDS EXPENDED UNDER THE MEASURE ARE GRANTS OF AID TO CHILDREN THROUGH THEIR PARENTS; ESTABLISHING THE PERCENTAGE OF ELEMENTARY AND SECONDARY SCHOOL STUDENTS WHO WILL BE ELIGIBLE TO PARTICIPATE IN PILOT PROGRAMS; PERMITTING THE GENERAL ASSEMBLY TO REPEAL ANY INEFFECTIVE PROGRAM; SPECIFYING THAT AFTER 2001, ANY PROGRAM FOR SCHOOL CHOICE ESTABLISHED BY THE GENERAL ASSEMBLY MUST BE MADE AVAILABLE TO ALL ELEMENTARY AND SECONDARY SCHOOL STUDENTS IN THE STATE; AND PROHIBITING ANY DECREASE IN PER PUPIL FUNDING FOR PUBLIC SCHOOL STUDENTS AS A RESULT OF IMPLEMENTING PILOT PROGRAMS WHILE NOT INCREASING THE AMOUNT THE STATE WOULD OTHERWISE EXPEND ON EDUCATION?

The summary prepared by the Board is as follows:

This measure directs the general assembly to establish one or more pilot programs to demonstrate the viability of parental choice in education. Pilot programs created under the measure are to be designed in a manner that provides a valid test of school choice as a mechanism to empower the greatest number of parents to select from the broadest array of quality educational options for their children while not increasing the amount the state would otherwise spend on education under the school finance act.

Under the measure, a minimum of ten percent of the state's total elementary and secondary school population are required to be eligible to participate in pilot programs during the 1995–96 school year. Thereafter, the number of eligible students is to be increased by at least five percent each year until 2001. The general assembly is directed to review pilot programs in January, 2001 and is authorized to repeal any ineffective program. After 2001, any program for school choice established by the general assembly must be made available to all elementary and secondary school students in the state. The general assembly is authorized to require any school that participates in a pilot program to meet certain academic standards that measure student cognitive development. The measure is not to be construed to allow or encourage the regulation of private educational systems beyond the authority which existed on January 1, 1994.

The measure expressly prohibits any decrease in per pupil funding for public school students as a result of implementing pilot programs. Any funds expended under the measure are expressly declared to be grants of aid to children through their parents and not to the schools where the children are enrolled. Funds may not be expended to purchase educational services from: any institution operated, controlled, or funded by any organization formed for political purposes; any institution that teaches hatred of any person or group on the basis of race, ethnicity, color, national origin, religion, or gender; or any institution that discriminates on the basis of race, ethnicity, color, or national origin.

The fiscal impact of this measure is indeterminate.

2/16/94 Hearing

Adjourned 2:45 p.m.