In the Matter of the TITLE, BALLOT TITLE AND SUBMISSION CLAUSE, and Summary Pertaining TO the PROPOSED TOBACCO TAX AMENDMENT 1994.

Pat R. Stealey, Petitioner,

and

Arnold Levinson and Marianne R. Neifert, Respondents,

and

Natalie Meyer, Stephen Erkenbrack, and Rebecca Lennahan, Title Setting Board.

No. 93SA345.

Supreme Court of Colorado, En Banc.

April 18, 1994.

Mark Bender, Denver, for petitioner.

Hayes, Phillips & Maloney, P.C., John E. Hayes, Denver, for respondent.

Gale A. Norton, Atty. Gen., Stephen K. ErkenBrack, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Maurice G. Knaizer, Deputy Atty. Gen., Denver, for Title Setting Bd.

Justice ERICKSON delivered the Opinion of the Court.

Petitioner Pat R. Stealey (Stealey), a registered elector of the State of Colorado, challenges the validity of the title, submission clause,[1] and summary set by the Initiative

---

1. The Initiative Title Setting Board referred to the ballot title and submission clause as a single unit. *See* § 1–40–102(2), 1B C.R.S. (1993 Supp.) (defining "ballot title" as the language that is printed on the ballot which is comprised of the submission clause and the title). This opinion will refer to the ballot title and submission clause as the "submission clause."

Title Setting Board (Board)[2] for a proposed initiated amendment to the Colorado Constitution (Initiative).[3] The Initiative would increase state taxes on cigarettes and tobacco products, repeal the state sales and use tax exemption on cigarettes, and grant municipalities and counties the authority to impose their own cigarette and/or tobacco taxes. The revenue derived from the measure would be used for health care, educational programs to reduce tobacco use, and research concerning tobacco use and tobacco-related illnesses.[4]

Stealey contends that the title, submission clause, and summary set by the Board are infirm because they do not reflect the true intent and meaning of the Initiative. After the Board's initial hearing, Stealey filed a motion for rehearing and, at the conclusion of the rehearing, the Board refused to adopt Stealey's proposed amendments to the title, submission clause, and summary. We affirm the ruling of the Board.

**I**

As required by statute, the proponents of the Initiative, Arnold Levinson and Marianne Neifert, submitted a draft of the Initiative to the directors of the legislative council and the office of legislative legal services for review and comment. The proponents modified the Initiative, and after comments were received and a public meeting held, a draft of the Initiative was presented to the secretary of state. The secretary of state convened the Board to designate and fix a title and submission clause and to prepare a summary. The Board held its initial hearing on December 1, 1993.

Prior to the hearing, the Board requested and received information from both the Office of State Planning and Budgeting (OSPB) and the Department of Local Affairs (DLA) regarding the fiscal impact of the proposed initiative. The OSPB estimated that in fiscal year 1996 the proposed amendment would generate maximum potential revenues to the

state of 132.1 million dollars. Letter, OSPB to secretary of state, November 26, 1993. The DLA stated: "A large tax increase such as that proposed [by the Initiative] ... will probably be a disincentive to the market and result in a decrease in tobacco sales. This would result in a decrease in revenue to local governments of an indeterminate amount." Letter, DLA to secretary of state, November 23, 1992. The DLA also stated that local governments would have increased revenues from the repeal of the sales and use tax exemption on cigarettes but concluded that the amount of such increase is indeterminate. *Id.* The DLA addressed the grant of authority to municipalities and counties to levy their own taxes on cigarettes and tobacco products and concluded: "This would result in increased revenues, but would be subject to the limitations of the Taxpayer's Bill of Rights, and cannot be estimated."

At the close of the hearing, the Board set the title, submission clause, and summary for the proposed amendment:

*Title*

STATE TAXES SHALL BE INCREASED $132.1 MILLION ANNUALLY BY AN AMENDMENT TO THE COLORADO CONSTITUTION TO INCREASE TOBACCO TAXES 2.5 CENTS PER CIGARETTE AND 50% OF THE MANUFACTURER'S LIST PRICE OF OTHER TOBACCO PRODUCTS, AND TO REPEAL THE STATE SALES AND USE TAX EXEMPTION FOR CIGARETTES, EFFECTIVE JULY 1, 1995; TO REQUIRE APPROPRIATION OF THE REVENUES PRIMARILY FOR HEALTH CARE, EDUCATIONAL PROGRAMS TO REDUCE TOBACCO USE, AND RESEARCH CONCERNING TOBACCO USE AND TOBACCO-RELATED ILLNESSES; AND TO AUTHORIZE MUNICIPALITIES AND COUNTIES TO IMPOSE CIGARETTE AND TOBACCO TAXES, SUBJECT TO ARTI-

2. The Board consists of the secretary of state, the attorney general, and the director of the office of legislative legal services or the director's designee. *See* § 1–40–106(1), 1B C.R.S. (1993 Supp.).

3. Review by this court is mandated by § 1–40–107(2), 1B C.R.S. (1993 Supp.).

4. The text of the Initiative is included as an appendix to this opinion.

CLE X, SECTION 20 OF THE COLORADO CONSTITUTION.

*Submission Clause*

SHALL STATE TAXES BE INCREASED $132.1 MILLION ANNUALLY BY AN AMENDMENT TO THE COLORADO CONSTITUTION TO INCREASE TOBACCO TAXES 2.5 CENTS PER CIGARETTE AND 50% OF THE MANUFACTURER'S LIST PRICE OF OTHER TOBACCO PRODUCTS, AND TO REPEAL THE STATE SALES AND USE TAX EXEMPTION FOR CIGARETTES, EFFECTIVE JULY 1, 1995; TO REQUIRE APPROPRIATION OF THE REVENUES PRIMARILY FOR HEALTH CARE, EDUCATIONAL PROGRAMS TO REDUCE TOBACCO USE, AND RESEARCH CONCERNING TOBACCO USE AND TOBACCO–RELATED ILLNESSES; AND TO AUTHORIZE MUNICIPALITIES AND COUNTIES TO IMPOSE CIGARETTE AND TOBACCO TAXES, SUBJECT TO ARTICLE X, SECTION 20 OF THE COLORADO CONSTITUTION.

*Summary*

This measure increases state tobacco taxes by 2.5 cents per cigarette (50 cents per standard pack of 20 cigarettes) and 50% of the manufacturer's list price of other tobacco products.

The measure requires the General Assembly to appropriate the revenues as follows: 50% for health care for people who cannot pay for care; 30% for school and community educational programs to reduce tobacco use; 10% for research on tobacco-related illnesses and the prevention of tobacco use; 5% for economic development including health-related business activities; 4% for municipalities and counties, and 1% for administration.

The measure establishes a citizens' commission to administer the uses of the revenues.

It repeals state laws that exempt cigarettes from sales and use taxes and provides that municipalities and counties receive 27% of the revenues from the repeal. It provides authority to municipalities and counties to regulate, and to tax in accordance with the provisions of Article X, Section 20 of the Colorado Constitution, the sale, use or consumption of cigarettes and other tobacco products.

The measure requires that existing taxes on cigarettes and tobacco products not be reduced or repealed. The measure's own tobacco tax rates will be reduced by up to 50% if any other amendment to the Colorado constitution is adopted at the same time that also increases tobacco taxes and uses the revenues for health care.

The fiscal impact of this measure is variable depending on the elasticity of sales of cigarettes and tobacco products. This measure is estimated to increase state cigarette and tobacco tax revenues and state sales and use tax revenues by $132.1 million annually. A portion of these increases could by offset by reductions in sales of cigarettes, other tobacco products and associated items. The net effect of these changes on state and local government revenues is not known.

After the Board's initial hearing, Stealey filed a motion for rehearing contesting the validity of the title, submission clause, and summary fixed by the Board. At the rehearing, Stealey presented the report of Dr. Dwight Lee, a professor of economics at the University of Georgia. Dr. Lee's report indicated that the Initiative would result in a first year loss to the state general fund of approximately 14.5 million dollars. At the conclusion of the rehearing, the Board rejected Stealey's proposed amendments.[5]

Subsequently, Stealey filed for review in this court. The issue in this original proceeding is whether the language set by the Board for the title, submission clause, and summary fairly and correctly expresses the true intent and meaning of the Initiative and

---

**5.** In *In re Proposed Tobacco Tax,* 830 P.2d 984 (Colo.1992), Stealey offered evidence from Dr. Lee in support of his assertion that the fiscal impact statement of the measure at issue in that case was misleading. *Id.* at 987 n. 4. The Board rejected Stealey's proposed amendments and we affirmed the Board's ruling.

whether the language adequately informs signers of petitions and voters of the Initiative's effects. We answer in the affirmative.

## II

The right to initiate a constitutional amendment is granted by Article V, Section 1(2) of the Colorado Constitution. The procedural statutes that prescribe the manner of exercising the right of initiative "were adopted to facilitate the exercise of this right." *Brownlow v. Wunsch*, 103 Colo. 120, 131, 83 P.2d 775, 780 (1938).

Section 1–40–105(1), 1B C.R.S. (1993 Supp.), requires the proponents of an initiative to submit the original draft of the initiative to the directors of the legislative council and the office of legislative legal services for review and comment. *See also* Colo. Const. art. V, § 1(5). Comments are then presented by the directors of the legislative council and the office of legislative legal services to the proponents at a public meeting no later than two weeks after the date of submission. § 1–40–105(1), 1B C.R.S. (1993 Supp.). The statutory procedure is designed to give proponents the opportunity to amend the petition in response to any comments received. *Id.* At the conclusion of this process, the initiative is submitted to the secretary of state, who assembles the Board for the purpose of designating and fixing a title, submission clause, and a summary for the proposed law. *Id.* "The purpose of the title setting process is to ensure that both [the] persons reviewing an initiative petition and the voters are fairly and succinctly advised of the import of the proposed law." *In re Proposed Initiative on Education Tax Refund*, 823 P.2d 1353, 1355 (Colo.1991) (hereinafter *Education Tax Refund Initiative*); *see also In re Proposed Initiative for an Amendment to Article XVI, Section 5, Colorado Constitution, Entitled "W.A.T.E.R.,"* 831 P.2d 1301, 1305 (Colo.1992) (hereinafter *In re Title Pertaining to "W.A.T.E.R.,"*).

The title, by definition, shall be "a brief statement that fairly and accurately represents the true intent and meaning of the proposed text of the initiative." § 1–40–102(10), 1B C.R.S. (1993 Supp.); *see also* § 1–40–106(3)(b), 1B C.R.S. (1993 Supp.) (stating that the title "shall correctly and fairly express the true intent and meaning" of the proposed law or constitutional amendment). "[T]he title board shall consider the public confusion that might be caused by misleading titles and shall, whenever practicable, avoid titles for which the general understanding of the effect of a 'yes' or 'no' vote will be unclear." § 1–40–106(3)(b), 1B C.R.S. (1993 Supp.).

The submission clause "shall be brief, shall not conflict with those selected for any petition previously filed for the same election, and shall be in the form of a question which may be answered 'yes' (to vote in favor of the proposed law or constitutional amendment) or 'no' (to vote against the proposed law or constitutional amendment)." *Id.* In addition, the submission clause set by the Board "shall unambiguously state the principle of the provision sought to be added, amended, or repealed." *Id.*

The summary is "a condensed statement as to the intent of the proposed law ... or constitutional amendment." § 1–40–102(9), 1B C.R.S. (1993 Supp.). It must "be true and impartial and shall not be an argument, nor likely to create prejudice, either for or against the measure." § 1–40–106(3)(a), 1B C.R.S. (1993 Supp.). If the Board determines that the proposed law or constitutional amendment will have a fiscal impact, the Board is required to request assistance from the OSPB or the DLA and include an estimate of any such fiscal impact, together with an explanation of the fiscal impact, in the summary. *Id.*

■ After the Board has fixed the title, submission clause, and summary, any registered elector may file a motion for a rehearing with the secretary of state based on a contention that they are "unfair or that they do not fairly express the true meaning and intent of the proposed state law or constitutional amendment." § 1–40–107(1), 1B C.R.S. (1993 Supp.). If overruled, the elector has the right to obtain review in this court. *Id.* The standards governing our review of the Board's actions are well established:

(1) [W]e must not in any way concern ourselves with the merit or lack of merit of the proposed [initiative] since, under our system of government, the resolution rests with the electorate;

(2) All legitimate presumptions must be indulged in favor of the propriety of the Board's action; and

(3) Only in a clear case should a title prepared by the Board be held invalid.

*In re Casino Gaming Initiative,* 649 P.2d 303, 306 (Colo.1982); *see also In re Workers Compensation Initiative,* 850 P.2d 144, 146 (Colo.1993) (recognizing that review of the Board's actions is substantially restricted); *Education Tax Refund Initiative,* 823 P.2d at 1355 (same); *In re Proposed Initiative on Parental Notification of Abortions for Minors,* 794 P.2d 238, 249 (Colo.1990) (same).

■ In performing its statutory duty, the Board is not required to describe every feature of a proposed measure. *In re Proposed Initiated Constitutional Amendment Concerning Limited Gaming in Manitou Springs, Fairplay and in Airports,* 826 P.2d 1241, 1244 (Colo.1992); *Education Tax Refund Initiative,* 823 P.2d at 1355. Nevertheless, the Board must consider "the public confusion that might be caused by misleading titles." § 1–40–106(3)(b), 1B C.R.S. (1993 Supp.). "The Board is given considerable discretion in resolving the interrelated problems of length, complexity, and clarity in designating a title ... and submission clause." *In re Proposed Initiative Concerning "State Personnel System,"* 691 P.2d 1121, 1125 (Colo.1984). Petition signers and voters should not be misled into supporting or op-posing a proposition by reason of the words employed. *Dye v. Baker,* 143 Colo. 458, 460, 354 P.2d 498, 500 (1960).

## III

### A

■ Stealey claims that the title, submission clause, and summary are infirm because they do not meet the requirements of Article X, Section 20 of the Colorado Constitution (popularly known as Amendment 1).

Initially, we note that a comparison of the requisite language for ballot titles involving tax increases set forth in Article X, Section 20 with the language of the submission clause in this case indicates that the Board complied with the provisions of Article X, Section 20 of the Colorado Constitution. Article X, Section 20(3)(c) provides:

Ballot titles for tax or bonded debt increases shall begin, "SHALL (DISTRICT) TAXES BE INCREASED (first, or if phased in, final, full fiscal year dollar increase) ANNUALLY ...?"

The beginning of the submission clause in this case reads:

"SHALL STATE TAXES BE INCREASED $132.1 MILLION ANNUALLY...." [6]

Although the Board utilized the language mandated by Article X, Section 20, Stealey contends that the adoption of Article X implicitly creates a duty of the Board to fully inform prospective petition signers and voters of the impact of tax-related constitutional amendments.[7] His assertion misstates the

---

**6.** Article X, Section 20(1) provides that the provisions of that section "supersede conflicting state constitutional, state statutory, charter, or other state or local provisions." This provision is not applicable in this case because there is no conflict between the provisions of Article 40, Title 1 of the Colorado Revised Statutes as applied by the Board and Article X, Section 20 of the Colorado Constitution.

**7.** Stealey also asserts that because the summary describes the amendment chronologically, rather than by subject matter, it violates the requirements of Article X, Section 20 of the Colorado Constitution. This convoluted assertion regarding the appropriate subject order of the summary is not based on the language of Article X or the

provisions of the Colorado Revised Statutes that address initiatives; instead, Stealey maintains that the public policy of Article X requires all tax issues be addressed first.

The summary is concise, clear, and fair. It contains six short paragraphs, including the fiscal impact statement. The only paragraph which does not address tax increases and tax policy changes is a one sentence paragraph which states that the "measure establishes a citizens' commission to administer the uses of the revenues." It is difficult to see how a reader of the summary could miss the discussion of tax increases and policy changes because five of the six paragraphs address these issues. We find no support for Stealey's assertion that Article X of

duty of the Board.[8]

■ Stealey raised a similar claim regarding the sufficiency of disclosure in *In re Proposed Tobacco Tax*, 830 P.2d 984 (Colo. 1992) (hereinafter *Tobacco Tax II* ). In *Tobacco Tax II* we held: "A ballot title and submission clause must be brief and need not describe every feature of a proposed measure in the title or in the ballot title and submission clause." *Tobacco Tax II*, 830 at 989 (citations and quotations omitted). We went on to note: "It is sufficient that voters are apprised, in general, that taxes on cigarettes and other tobacco products would increase under the proposed measure." *Id.* at 990. Although Article X, Section 20 of the Colorado Constitution was not in effect when we decided *Tobacco Tax II*, the subsequent adoption of Article X did not obligate the Board to disclose every ramification of a proposed tax measure. We have recognized:

There is no requirement that every possible effect of a measure be included within the title or the ballot title and submission clause. Certainly, therefore, effects of a measure which might be implied but would not occur, cannot be required to be included in the descriptions which are statutorily required to be brief.

*See, e.g., In re Initiative Concerning "Taxation III,"* 832 P.2d 937, 941 (Colo.1992). Article X, Section 20 does not alter this principle.

In the alternative, Stealey contends that even if Article X does not require complete disclosure of every tax issue, it does require the Board to include a dollar figure setting forth the amount of additional local taxes that would result if the amendment were adopted. Stealey bases this contention on Article X, Section 20(1), which provides that other limits on district revenue, spending, and debt may be weakened only by future voter approval.

The Initiative does not result in an increase in local governments taxes; it allo-

cates the revenue from state taxes to local governments. Section 8 of the Initiative provides:

Effective July 1, 1995, the laws exempting cigarettes from state sales and use taxes are hereby repealed. Municipalities and counties shall receive the aggregate amount of twenty-seven percent of the state proceeds for such repeal, and such amount shall be allocated among municipalities and counties according to the local government distribution formula for the revenues attributable to the statewide cigarette tax existing as of January 1, 1993.

Pursuant to this section of the Initiative, only state taxes are increased. Contrary to Stealey's contention, nothing in the proposed measure increases local taxes. Because the measure does not include a specific provision which raises local taxes, the Board did not abuse its discretion in excluding any reference to an increase in local taxes.

Stealey notes that there are three main tax issues contained in the proposed tobacco tax amendment: (1) repeal of the state sales and use tax exemption on cigarettes; (2) an increase in the state cigarette and tobacco tax; and (3) a grant of authority for municipalities and counties to impose their own additional cigarette and/or tobacco taxes. All three of these issues are set forth in the title, submission clause, and summary with sufficient particularity to apprise voters that the proposed amendment would increase taxes on cigarettes and tobacco products.

### B

■ Stealey also challenges the title and submission clause, asserting that they are infirm because they fail to mention the creation of a citizens' commission on tobacco and health to dispense revenues collected by the proposed tobacco tax amendment. In addition, he maintains that the title, submission clause and summary do not reflect the Initia-

the Colorado Constitution requires that all initiative summaries be listed in a certain order.

8. The General Assembly has provided for the publication of all proposed initiatives in § 1–40–124, 1B C.R.S. (1993 Supp.). We have previously recognized that the title, submission clause,

and summary are not intended to fully educate the people on all aspects of a proposed law or constitutional amendment. *See In re Increase of Taxes on Tobacco Products Initiative*, 756 P.2d 995, 998 (Colo.1988).

tive's requirement that the spending categories and mandated appropriations contained therein can only be changed by another voter-approved constitutional amendment.

Stealey's assertions of infirmity are similar to challenges to previous tobacco tax initiatives. *See Tobacco Tax II,* 830 P.2d at 984 (1992); *In re Increase of Taxes on Tobacco Products Initiative,* 756 P.2d 995 (Colo.1988) (hereinafter *Tobacco Tax I* ).

In *Tobacco Tax II,* Stealey maintained that the title and submission clause of a proposed tobacco tax initiative omitted language relating to the authority of a commission to fund teacher training projects using the increased tax revenue from the initiative. We found that the authority of the proposed commission to designate which programs receive funding was "not a central feature of the proposal, and accordingly the Board was within its discretion to omit this information." *Tobacco Tax II,* 830 P.2d at 990.

Similarly, in *Tobacco Tax I,* the summary of a tobacco tax initiative was challenged because it did not state that funds generated by the proposed law that would be allocated to health care programs were in addition to funds currently allocated to these programs. We rejected the challenge and stated:

> It is clear from reading the proposed law that its primary purpose is to raise additional revenues through a tax increase on tobacco products and to use these revenues to fund health care programs for the medically indigent and programs for smoking-related diseases. The summary clearly and impartially expresses this basic purpose. The fact that the summary fails to mention that these programs presently receive funding from a different source does not amount to an invalidating infirmity. Our observations in *In re Proposed Initiative on Transfer of Real Estate,* 200 Colo.

40, 43, 611 P.2d 981, 983 (1980), concerning a proposed constitutional amendment are equally applicable to the proposed legislation at issue here: "We do not consider that the failure to mention the existence of a statute addressing the same or similar subject as that of the proposed amendment has any effect on the acceptability of the ... summary.... As we have said, that language need only express the intent and meaning of the proposed constitutional amendment." Furthermore, the summary is not intended to fully educate the people on all aspects of the proposed law.

*Tobacco Tax I,* 756 P.2d at 998.

Neither the failure to refer to the creation of a citizens' commission on tobacco and health in the title or submission clause nor the lack of a specific statement that spending categories and required appropriations contained in the proposed amendment may only be changed by a subsequent constitutional amendment are central features to the proposal in this case. As we stated in *In re Title Pertaining to Confidentiality of Adoption Records,* 832 P.2d 229, 232 (Colo.1992):

> While the title, ballot title and submission clause, and summary may not reflect the Petitioner's preference of what the amendment should include, we conclude that the Board set out in the title, ballot title and submission clause, and summary a clear statement of the proponent's initiative reflecting its intent and fairly advising the voters of the import of the proposed law.

### C

Stealey's final claim is that the summary does not include an adequate statement of fiscal impact. Specifically, he asserts that the Board failed to disclose the amount that cigarette taxes would decline if the amendment is adopted.[9]

Thus, in addition to challenging the disclosure of the effect of the tax, Stealey contends that the first year expense of implementing the Initiative should be disclosed. Given the Board's expansive authority, we do not believe the Board abused its discretion in failing to separately disclose an expense that amounts to less than one tenth of one percent of the estimated revenues.

**9.** Stealey's proposed fiscal impact statement provides:

> The fiscal impact of the measure is variable depending on the elasticity of sales of cigarettes and tobacco products, however, the net effect on the state's general fund would be the approximate loss of $14.5 million annually on the sale of cigarettes, and the required expenditure of $117,228 to $137,450 to administer the tax.

The Board is not required to determine the exact fiscal impact of each proposed measure; if the Board finds that the proposed initiative will have a fiscal impact on the state or any of its political subdivisions, the summary must include an estimate and explanation. § 1–40–106(3)(a), 1B C.R.S. (1993 Supp.); *In re Constitutional Amendment Respecting the Rights of the Public to Uninterrupted Service by Public Employees*, 200 Colo. 141, 613 P.2d 867 (1980). The reason for requiring a fiscal impact statement is to make certain that the fiscal implications of a proposed measure are given consideration and the electorate is fully informed. *In re Title Pertaining to "W.A.T.E.R.,"* 831 P.2d at 1306; *Citizens for Free Enterprise v. Department of Revenue*, 649 P.2d 1054, 1060 (Colo.1982). A separate explanation of the fiscal impact of a measure is not required when the fiscal impact cannot be reasonably determined from the materials submitted to the Board due to the variables or uncertainties inherent in the particular issue. *In re Title Pertaining to "Tax Reform,"* 797 P.2d 1283, 1291 (Colo.1990).

The Board requested and received information from the OSPB and the DLA. The OSPB concluded that if the Initiative were implemented, tax revenues from the sale of cigarettes would increase. The DLA stated that the Initiative will probably result in a decrease in tobacco sales but concluded that the amount of the decrease is indeterminate. Stealey asserts that if the Initiative passes, cigarette tax revenues will decline by approximately 14.5 million dollars annually.

The reason for the disparity in the predictions regarding the effect of implementing the Initiative is the elasticity of cigarette and tobacco product sales. The Board recognized that the evidence was not conclusive because of the inability of statistics to predict how many current cigarette smokers or tobacco product users will cease to use those products. The Board also recognized the difficulty of attempting to determine how many, if any, counties or municipalities will enact local sales or use taxes relating to cigarettes or tobacco products. Based on the absence of reliable and conclusive informa-

tion, the Board ruled that the fiscal impact of the proposed amendment was variable.

In *Tobacco Tax II*, Stealey challenged the fiscal impact statement of a proposed tobacco tax initiative. We stated:

The record demonstrates that there are a large number of variables that bear on the number of cigarettes and quantity of tobacco products that will be sold if the measure is adopted. The volume of sales in turn will determine the fiscal impact of the proposed statutory changes on state and local governments. This is explained in the summary in a general way. The interrelationship of the variables that will determine sales volume is extremely complex, and the parties vigorously contest each other's estimates of the impact the measure would have. Given the Board's considerable discretion in framing of a fiscal impact statement, we decline to reverse the Board's conclusion that the "net effect of [the proposed] changes on state or local government revenues is not known."

*Tobacco Tax II*, 830 P.2d at 991–992.

In this case, the evidence is nearly identical to the evidence reviewed by the Board in *Tobacco Tax II*. We see no reason to deviate from our holding in *Tobacco Tax II*. Accordingly, we hold that given the disparate conclusions of the OSPB, the DLA, and Stealey's expert, the Board acted within its authority in making the decision to include in the summary the statement that the net effect of the changes on state or local governments is not known.

### IV.

We conclude that the title, submission clause, and summary fixed by the Board correctly and fairly represent the true intention and meaning of the proposed amendment. Accordingly, we affirm the ruling of the Board.

### APPENDIX A

BE IT ENACTED BY THE PEOPLE OF THE STATE OF COLORADO:

Article X of the Constitution of the State of Colorado is hereby amended by the addition of the following new Section 21, to read:

Section 21. **Tobacco taxes for health protection.** (1) The people of Colorado hereby declare that:

(a) Tobacco use is the foremost cause of preventable illness and death in Colorado.

(b) Tobacco use causes cancer, heart and lung disease, and other illnesses, which create a staggering economic burden that all Coloradans must bear.

(c) Children are highly susceptible to tobacco addiction and are gravely harmed by tobacco use.

(d) Tobacco taxes are an effective means of preventing and reducing tobacco use.

(e) It is the intention of the people of Colorado to increase tobacco taxes in order to promote public health and to generate revenues to provide health care for children and others who lack the means to pay for it, programs to prevent and reduce tobacco use, research on tobacco-related illnesses and their prevention, and economic development including health-related business activity.

(2)(a) For purposes of this section 21, the term "tobacco products" shall have the same meaning as provided in the state law existing as of January 1, 1993, which imposes a tax on the sale, use, consumption, handling, or distribution of tobacco products by distributors. As stated in said state law, the term shall not include cigarettes.

(b) Effective July 1, 1995, there are hereby imposed the following taxes:

(1) A statewide cigarette tax, on the sale of cigarettes by wholesalers, at the rate of 25 mills (2.5 cents) per cigarette; and

(2) A statewide tobacco products tax, on the sale, use, consumption, handling, or distribution of tobacco products by distributors, at the of 50 percent of the manufacturer's list price thereof.

(c) The taxes imposed by paragraph (b) shall be in addition to any other taxes, existing as of January 1, 1993, or thereafter adopted, on the sale or use of cigarettes by wholesalers and on the sale, use, consumption, handling, or distribution of tobacco products by distributors. The tax-

es imposed by paragraph (b) shall be collected by the state revenue department in the same manner as such other existing taxes.

(3) Notwithstanding Article XXIV of this constitution, the aggregate revenues from the statewide taxes imposed pursuant to paragraph (b) of subsection (2) shall be appropriated annually by the general assembly, only in the following proportions, and for the following purposes as determined by the citizens' commission on tobacco and health established under subsection (6):

(a) Fifty percent of such revenues shall be appropriated for purposes of programs to promote and provide health care to people who need such care but who are unable to afford the cost, with equal proportions to be used for purposes of programs for children and pregnant women and for purposes of programs for other persons;

(b) Thirty percent of such revenues shall be appropriated for purposes of school and community programs and educational campaigns to prevent and reduce tobacco use, and for purposes of evaluation of such programs and campaigns, with not less than one-third of said appropriation to be made available for in-school programs of tobacco-use education and prevention activities provided during school hours by qualified personnel;

(c) Ten percent of such revenues shall be appropriated for purposes of programs of research concerning tobacco-related illnesses and strategies for the prevention and cessation of tobacco use;

(d) Five percent of such revenues shall be appropriated for purposes of programs of economic development including health-related business activity;

(e) One percent of such revenues shall be appropriated for purposes of costs of administration of the citizens' commission on tobacco and health established under subsection (6); and

(f) Four percent of such revenues shall be appropriated to municipalities and counties and shall be distributed in the same proportions and in the same manner as revenues attributable to the statewide cig-

arette tax that existed as of January 1, 1993.

(4) Revenues which are appropriated but not expended in any year shall not revert to the general fund but shall be reappropriated in the following year for the purposes set forth in subsection (3).

(5) The revenues appropriated pursuant to paragraph (a) of subsection (3) shall be in addition to and not a substitute for funds otherwise appropriated by the general assembly for the purpose of programs to promote and provide health care to persons who need such care but who are unable to afford the cost.

(6)(a) Except as otherwise provided herein, the administration of this section 21 shall be under a citizens' commission on tobacco and health. The commission shall be composed of citizens with interest and background in tobacco-related health problems, education, and provision and financing of health care.

(b) The commission shall consist of eleven members, nine of whom shall be appointed by the governor, with the consent of the senate, one of whom shall be appointed by the president of the senate, and one of whom shall be appointed by the speaker of the house. The term of each appointment shall be three years, except that, of the members appointed to take office in 1995, the governor shall appoint three for one-year terms, four for two-year terms, and two for three-year terms, the president of the senate shall appoint one for a three-year term, and the speaker of the house shall appoint one for a three-year term. The initial appointments shall be made no later than May 1, 1995.

(c) The commission shall include a member from each congressional district, and no more than six of the members shall be members of the same political party.

(d) The commission shall be created within the state health department, but shall exercise its powers, duties, and functions independently of the head of said department.

(e) Commission members shall not be compensated for their service, but the administrative costs pertaining to the functions of the commission, including necessary expenses actually incurred by members in the performance of their duties as such, shall be funded from the appropriations made pursuant to paragraph (e) of subsection (3).

(f) No later than October 1, 1995, the commission shall promulgate and may thereafter from time to time amend, in the manner authorized by law for the promulgation of administrative rules and regulations, rules and regulations relating to the administration of this section 21.

(7) Municipalities, and counties as to unincorporated areas, may adopt local laws imposing licenses or fees on, or regulating, the business, occupation, or privilege of selling cigarettes or tobacco products, or regulating the sale, use, or consumption of cigarettes or tobacco products. In addition, municipalities, and counties as to unincorporated areas, may adopt, subject to the provisions of section of 20 of this article, local laws imposing taxes on the business, occupation, or privilege of selling cigarettes or tobacco products, or on the sale, use, or consumption of cigarettes or tobacco products. No law shall require, as a condition of the distribution or receipt of any statewide tax revenues or otherwise, that municipalities or counties refrain from adopting any of the local laws referred to in this subsection.

(8) Effective July 1, 1995, the laws exempting cigarettes from state sales and use taxes are hereby repealed. Municipalities and counties shall receive the aggregate amount of twenty-seven percent of the state proceeds from such repeal, and such amount shall be allocated among municipalities and counties according to the local government distribution formula for the revenues attributable to the statewide cigarette tax existing as of January 1, 1993.

(9) Neither the taxes imposed by this section 21, nor any taxes existing as of January 1, 1993, on the sale of cigarettes by wholesalers or on the sale, use, consumption, handling, or distribution of tobacco products by distributors, nor any

formula, existing as of January 1, 1993, for the distribution to municipalities and counties of revenues attributable to the statewide cigarette tax existing as of January 1, 1993, shall be repealed or reduced by the general assembly.

(10) Should another amendment to the constitution be adopted at the same election at which this section 21 is adopted, which other amendment imposes statewide cigarette or tobacco taxes, or both, for the sole purpose of providing and promoting health care for people who need such care but are unable to afford the cost, the tax rates in paragraph (b) of subsection (2) shall be reduced by the amount of the rates provided in the other amendment, up to a maximum reduction of one-half of the rates set forth in said paragraph (b), and the revenues appropriated pursuant to paragraph (a) of the subsection (3) shall be reduced by the amount of aggregate revenues that, pursuant to the other amendment, are derived from cigarette or tobacco taxes, or both, and are dedicated to health care. If no such other amendment is so adopted, this subsection (10) is repealed as of the day after the official declaration of the vote of this section 21 by proclamation of the governor.

(11) This section 21 shall be self-executing, and any conflicting constitutional or statutory provisions are hereby repealed to the extent of such conflict.