The COLORADO DEPARTMENT OF PERSONNEL; Andre N. Pettigrew, Executive Director of the Colorado Department of Personnel, The Colorado Department of Revenue; and Terrance Fagan, Executive Director of the Colorado Department of Revenue, Petitioners,

v.

Cathy ALEXANDER, John Bailey, Ana C. Bowman, Tom Bovio, Vicki Bunch, Gloria Carino, Joe Chase, Joyce Chevarria, Joann Christensen, Rich Copley, Mike Coulter, Art Crespin, Michele Cyr, Christine Dexter, W. David Driscoll, Felipe Duran, Larry Frazier, Robert L. Glidden, Cynthia A. Granner, Thomas Herman, Louis Hoefer, Bob Jeannelle, Gary Jensen, Karen Jones, Larry Jordahl, Karen Karl, Cary Kelliher, Dave Kennedy, Michelle Kerstann, Kent Le-Blanc, Dave Loomis, Gray Maelzer, Dee Malonson, Christina A. Mathey, Joe Markworth, Gary May, Dorothy McKay, Jim McNaught, Jim Meyers, Robert S. Mitchell, John Mohatt, Michelle Mongan, Darlene Muniz, Bruce Nelson, Robert Osborne, Vince Palkovich, John Petersen, Douglas Pollack, Dick Pond, Linda Quade, William Rayner, Mary Robyn, Virginia E. Ruge, Mike Santos, Karen Shaw, Tammy Sorensen, Joseph Soss, Sharon Steher, Phil Stricklan, Dana Summers, Nancy Tanner, August Tilger, Larry Toillion, Gary Toleno, Karen Torsney, John Trujillo, David C. Valenciano, Richard Victorson, Lloyd Wicke, Larry Williams, John Wilton, Trish Windham, Donna Wright, Rebecca Gillespie, Wendell Miller, Raymond A. Cardy, Chris J. Eliopulos, James K. Hinz, Ronald H. Granner, William V. Speckman, and John C. Streeter, Respondents.

No. 97SC719.

Supreme Court of Colorado, En Banc.

Nov. 30, 1998.

As Modified on Denial of Rehearing Jan. 11, 1999.

Gale A. Norton, Attorney General, Martha Phillips Allbright, Chief Deputy Attorney General, Richard A. Westfall, Solicitor General, Paul Farley, Deputy Attorney General, David M. Kaye, First Assistant Attorney General, John D. Baird, Assistant Attorney General, State Services Section, Denver, Colorado, Attorneys for Petitioners.

James R. Gilsdorf, Denver, Colorado, Attorney for Respondents.

Justice HOBBS delivered the Opinion of the Court.

In this appeal, the Colorado Department of Personnel (Department) challenges the judgment of the court of appeals reversing the trial court and concluding that the Department's failure to obtain gubernatorial approval before implementing pay decreases constituted an abuse of discretion.[1] *See Alexander v. Colorado Dep't of Personnel*, 952 P.2d 814 (Colo.App.1997). The court of appeals determined that the statewide job evaluation system study conducted by the Department was a reorganization with a fiscal impact requiring approval of the Governor under section 24–50–104(4)(d)(II), 10B C.R.S. (1988 & 1993 Supp.).[2] *See Alexander*, 952 P.2d at 819. It concluded that the Governor had not approved decreasing the salaries of the revenue agent and tax conferee positions. *See id.*

We agree with the court of appeals that implementation of the statewide job evaluation study constituted a reorganization re-

---

**1.** We granted certiorari on the following issues: (1) Whether a state-wide job evaluation system study which includes adjusting pay grades downward for certain classes of employees in the state personnel system is subject to the reporting and approval requirements of § 24–50–104(4)(d)(II), 7 C.R.S. (1997).

(2) In the event such a state-wide system study that adjusts pay grades downward is subject to the approval of the governor pursuant to § 24–50–104(4)(d)(II), 7 C.R.S. (1997), whether gubernatorial approval occurs through the budget process and the delegation of executive duties to the director.

**2.** We decide this case based on law existing in 1993.

quiring gubernatorial approval as contemplated by section 24–50–104(4)(d)(II), 10B C.R.S. (1993 Supp.). However, the Governor transmitted his approval of implementing the statewide job evaluation study through his letter of January 14, 1994 to the Joint Budget Committee (JBC) in connection with the annual salary and fringe benefit survey which became effective July 1, 1994, under section 24–50–104(5)(g)(I), 10B C.R.S. (1993 Supp.). Consequently, we reverse the judgment of the court of appeals.

## I.

Based upon a number of independent salary survey performance audits, the Governor's Commission on Productivity, in the late 1980s, recommended studying and undertaking major revisions to the state's job evaluation system. In response, the Department initiated a statewide revision of the job evaluation system in 1991, referred to as the Job Evaluation System Redesign Project (statewide job evaluation system study). Among its objectives were: (1) to write fewer, broader class descriptions with accurate, updated concepts using consistent job evaluation factors; (2) to have subject matter experts participate in the actual evaluation of jobs in the classes; and, (3) to review the salary relationship of all classes using market data provided by the Department's compensation unit.

The Department conducted the statewide study under its statutory responsibility for maintaining and revising the system of classes covering all positions in the state classification system. *See* § 24–50–104(3), 10B C.R.S. (1993 Supp.). The System Maintenance Questionnaire (SMQ) served as the Department's primary data collection tool for obtaining information on jobs and salaries. The Department requested a sample of positions representing all agencies and classes and used the results of the SMQs to draft new class descriptions.

The statewide job evaluation system study involved extensive research in the field of job evaluation, surveys, and assessments of alternative systems for the purpose of developing a job evaluation strategy. The project also included reviewing salary relationships of all job classes through the use of market data provided by the Department's compensation unit. The objective was to revise salaries in accordance with market standards.

On June 1, 1993, Shirley Harris, the Executive Director of the Colorado Department of Personnel (Director), issued a Proposed Job Evaluation Project Narrative Report (Narrative Report) and Class Series Descriptions for the positions of revenue agent and tax conferee. The pay grade changes recommended by the Narrative Report impacted thousands of state employees, not just the revenue agent and tax conferee positions. The report proposed new titles for the positions of revenue agent and tax conferee, and also proposed pay grade decreases for seven of the eight classes within these two jobs. The Director declared the pay grade adjustments to be effective September 1, 1993.

Cathy Alexander and other employees in the positions of revenue agent and tax conferee (Alexander) appealed the Director's Job Evaluation and Class Series Descriptions for the positions of revenue agent and tax conferee. The Director reviewed the appeal, pursuant to section 24–50–104(4)(d)(I), 10B C.R.S. (1993 Supp.), and issued her decision regarding the job evaluation system on September 16, 1993 and September 20, 1993 (September 1993). Although the Director denied Alexander's request for relief, she remanded the issue to the Department for further review because she deemed the use of certain data to be arbitrary.

In October 1993, Alexander filed a complaint in the district court; the district court dismissed the complaint without prejudice because the agency action was not then final.

In response to the Director's September 1993 decision, the Department convened a mini-panel to evaluate and revise the job descriptions. Additionally, the Department reviewed salary surveys performed by the Federation of Tax Administrators in Washington, D.C.; however, the Department could not rely on this data because it was five years old. As an alternative, the Department's compensation unit obtained permission from the Total Compensation Advisory

Council to perform numerous direct surveys of other states.

After receiving responses from forty-three states and the District of Columbia, the Department utilized salary data for classes from twenty-eight states it determined to be proper matches. Upon analyzing the data received, as well as annual local salary surveys, the Department recommended new pay grades for a number of positions, including the revenue agent and tax conferee positions.

During the time period that the Department was collecting further data as ordered by the Director, the Director reported the pay grade changes for the positions of revenue agent and tax conferee in the annual salary and fringe benefits survey[3] to the Governor. This survey, referred to as the 1994 Total Compensation Survey (survey), indicated that "[t]he two events causing the greatest impact on this year's survey have been a legislative change, House Bill 93–1008, and *the Department of Personnel's implementation of a new job evaluation system.* The most significant impact on the survey has been the implementation of an entirely new job evaluation system in September 1993." The Department noted in the survey that the "change in the job evaluation system had several significant impacts on the cash survey process and the recommendations." (Emphasis added.)

Upon reviewing the 1994 salary and fringe benefits survey, the Governor approved the study's recommendations and results. The survey contained job classifications and salary adjustments that the Director had declared to be effective as of September 1, 1993. The Governor submitted the annual survey to the JBC; it included the proposed compensation plan for fiscal year 1994–95 and the job classification titles as revised by the statewide job evaluation system study, including the positions at issue in this case, not the titles that existed prior to the system study.

In his January 14, 1994 letter to Representative Tony Grampsas, the Chairman of the JBC,[4] the Governor endorsed the statewide job evaluation system study and its competitive labor market approach:

I support the statutory philosophy that total compensation for classified employees be comparable to our competitive labor market. The salary and benefit recommendations contained in the report are consistent with that philosophy. I support full funding of these recommendations and implementation without any delays; July 1, 1994, for salary and premium pay adjustments and December 1994 employer premiums for benefit enhancements. I hope we are able to work together to implement as many of these recommendations as possible.

Attached to the Governor's letter was the 1994 Total Compensation Survey summary report, referencing and incorporating the Department's new job evaluation system.

Subsequently, the Director reviewed the new data she had ordered to be collected on September 1993 and, on April 26 and May 2, 1994, the Director issued a Job Evaluation letter and proposed changes to the class descriptions and grade levels for the positions of revenue agent and tax conferee. The letter and class descriptions amended the Narrative Report issued by the Director on June 1, 1993.

On August 11, 1994, the Director issued a decision affirming the agency's decision to reduce Alexander's pay grades. In response, on September 11, 1994, Alexander filed a complaint in the district court to review the Director's decision.

The district court upheld the Director's decision as being within her discretion. The district court determined that the statewide job evaluation system study constituted a reorganization, pursuant to section 24–50–104(4)(d)(II), but it found that the Director's actions fell within the urgent situation exception provided under that section.[5] *See* § 24–

---

3. The Director was statutorily required to conduct an annual salary and fringe benefits survey. *See* § 24–50–104(5)(a), 10B C.R.S. (1993 Supp.).

4. The Governor's transmittal letter is included in the record and reproduced as Appendix A to this opinion.

5. The relevant language in section 24–50–104(4)(d)(II) provided that:
   [T]he only exception to the July 1 date regarding any assignment or reassignment of classes to pay grades, salary rates, or salary ranges, including those resulting from special salary surveys, shall be made in those urgent situa-

50–104(4)(d)(II), 10B C.R.S. (1993 Supp.). Under this provision, the district court determined that the Director's implementation of the pay decreases did not constitute an abuse of discretion.

On appeal, the court of appeals determined that the statewide study constituted a reorganization triggering the requirement of section 24–50–104(4)(d)(II) for the Director to obtain the Governor's approval. *See Alexander*, 952 P.2d at 819. The court of appeals concluded that, even if it were to be persuaded that the Director implemented such changes due to an "urgent situation," the statute nevertheless required the Department to obtain gubernatorial approval. The court of appeals concluded that the Department failed to obtain gubernatorial approval as required by section 24–50–104(4)(d)(II).

The Department contends that implementation of the statewide job evaluation system study did not constitute a "reorganization" as contemplated by the legislature in section 24–50–104(4)(d)(II). The Department also argues that the study did not cause an overall increase in costs due to offsetting increases and decreases and, therefore, did not require gubernatorial approval. Thus, the Department would have us hold that section 24–50–104(4)(d)(II) does not apply to the statewide job evaluation system study because that section only pertains to reorganizations having an increased fiscal impact on the state.

## II.

We hold that (1) the implementation of the statewide job evaluation system study consti-

tuted a reorganization governed by section 24–50–104(4)(d)(II) requiring the Governor's approval, and that (2) the requisite gubernatorial approval and transmittal to the JBC occurred when the Governor, on January 14, 1994, submitted the annual salary and fringe benefit survey to the JBC. The survey and the Governor's letter to the JBC addressed the Department of Personnel's implementation of the new job evaluation system. In accordance with section 24–50–104(5)(g)(I), 10B C.R.S. (1993 Supp.), the General Assembly's implementation of the reorganization became effective July 1, 1994.

### A.

#### *Reorganization*

■ The legislature did not supply a definition of "reorganization." Although reorganization typically refers to a reduction in force, the provision at issue in this case includes reference to a reorganization that has a fiscal impact on the state budget.[6] The implementation of the statewide job evaluation system study recommended the restructuring of every position statewide. Given the magnitude of the implementation of the study and the fiscal impact it had on the state budget, we conclude that the study constituted a reorganization that required Governor approval and submission to the General Assembly prior to its implementation. *See Colorado Common Cause v. Meyer*, 758 P.2d 153, 160 (Colo.1988)(stating that a court may consider the consequences of a

tions where personnel shortages will endanger the health, safety, or welfare of citizens of the state of Colorado and where special salary surveys utilized as a part of that study indicate that such assignment or reassignment of classes is necessary to provide salaries comparable to those prevailing in comparable kinds of employment. In such urgent situations, upon approval of the governor and the state personnel director, such changes shall be effective on the first day of the month following such approval.

§ 24–50–104(4)(d)(II), 10B C.R.S. (1993 Supp.).

**6.** Section 24–50–104(4)(d)(II) stated in pertinent part:

Any assignments or reassignments of classes to pay grades, salary rates, salary ranges, or pay relationships required by the creation of new positions or any duly authorized reorganization or change in work method which have a fiscal impact shall be made effective, with the approval of the governor, on the ensuing July 1.

§ 24–50–104(4)(d)(II), 10B C.R.S. (1993 Supp.). There is no dispute that the study did not involve the creation of new positions or a change in work methods. At issue is whether the court of appeals properly characterized the pay study as constituting the kind of reorganization having a fiscal impact as contemplated by section 24–50–104(4)(d)(II).

particular construction when attempting to effectuate the purpose of a statute).

### 1.

#### *Gubernatorial and Legislative Roles*

The statewide job evaluation system study involved the statewide restructuring of many positions, not simply the revenue agent and tax conferee positions. The department restructured job descriptions of several positions, restructured pay relationships, and restructured responsibilities assigned to positions. The Department implemented the studies in order to revamp the pay relationship of these newly created or revised positions.

In *Dempsey v. Romer*, 825 P.2d 44, 56 (Colo.1992), we emphasized the checks and balances between the executive and legislative branches of government in state agency fiscal matters. In *Dempsey*, state employees filed an action against the Governor and the Executive Director of the Department of Personnel, arguing the unconstitutionality of a statute that established a maximum monthly salary level payable to state employees. Specifically, the state employees asserted that the director is constitutionally vested with the power to formulate compensation levels for state employees because the director is vested with the authority to establish classifications and pay grades. *See id.* at 51.

In *Dempsey*, we rejected this argument, relying on our prior decision in *Vivian v. Bloom*, 115 Colo. 579, 177 P.2d 541 (1947). In *Vivian*, petitioners also asserted that the Colorado Constitution provides an executive agency with exclusive authority not only to establish positions, classes, and grades on the basis of merit, but also to establish the compensation level payable to such positions, classes and grades. *See id.* at 581, 177 P.2d at 542. We concluded that the executive agency's power to classify did not include the power to compensate as well. *See id.* at 585, 177 P.2d at 544. Further, we stressed that "the electorate of this state rejected such model in favor of a system that separated the legislative power of appropriation from the

executive power of classification." *Id.* at 585–86, 177 P.2d at 544.[7]

Relying on our rationale in *Vivian*, we stressed in *Dempsey* that "any effort by the General Assembly to transfer the legislative authority of appropriation to an officer in the executive department of government might raise serious constitutional separation of powers questions." *Dempsey*, 825 P.2d at 54. Further, we recognized that one of the primary functions of the General Assembly is to determine the amount of money to be spent on carrying out public policies of the state and that the personnel budget of the state is a significant category of each annual budget. *See id.* at 56. Because the revamping of the entire job evaluation system and changes to various pay grades significantly impacts the annual state budget and the legislature's appropriation prerogatives, the legislature provided for gubernatorial and legislative involvement in the implementation of a reorganization.

As we pointed out in *Dempsey*:

> To construe the statutory scheme establishing the state personnel system as authorizing an appointed executive officer to control the appropriations process as it is impacted by classification and reclassification decisions would represent a major alteration of the system of checks and balances prevailing in the arena of governmental fiscal responsibility.

*Id.* at 56. Thus, section 24–50–104(4)(d)(II) required the approval of the Governor and submission of the pay adjustments to the JBC.

### 2.

#### *Fiscal Impact of the Reorganization*

■ The Department contends that even if this was a reorganization, section 24–50–104(4)(d)(II) did not apply because the reorganization did not have an overall increased fiscal impact on the state due to offsetting increases and decreases. Section 24–50–104(4)(d)(II) provided in pertinent part:

> Any assignments or reassignments of classes to pay grades, salary rates, salary

7. The 1970 initiative did not alter this fundamental distinction. *See Dempsey,* 825 P.2d at 53.

ranges, or pay relationships required by the creation of new positions or any *duly authorized reorganization* or change in work method which have *a fiscal impact* shall be made effective, with the approval of the governor, on the ensuing July 1. § 24–50–104(4)(d)(II), 10B C.R.S. (1993 Supp.) (emphasis added).

We disagree with the Department's contention. The General Assembly did not statutorily define the term "fiscal impact," as utilized in section 24–50–104(4)(d)(II). Accordingly, to discern the legislature's intent, we give "words and phrases their plain and ordinary meaning." *Meyer,* 758 P.2d at 160.

The term "fiscal impact" can refer to either increases or decreases in government spending. For example, section 1–40–106, 1 C.R.S. (1998), provides that the title board must include information pertaining to the fiscal impact that a proposed initiated law or constitutional amendment will have on the state or its political subdivisions. *See* § 1–40–106(3)(a), 1 C.R.S. (1998). Fiscal impact includes both increases and decreases in revenues and costs. *See In re Proposed Petition (Petitions),* 872 P.2d 689, 696–97 (Colo. 1994); *see also In re Proposed Amendment to Constitution,* 907 P.2d 586, 596 (Colo.1995) (pointing out that initiative's proposed requirement to have local governments pay the costs of suits successfully brought against them could have a negative fiscal impact on them); *In re Mineral Production Tax Initiative,* 644 P.2d 20, 26 (Colo.1982) (stating that proposed severance tax amendment would provide an increase in government revenue of $100 million each year).

We conclude that "fiscal impact" of the reorganization under section 24–50–104(4)(d)(II) included increases and decreases in salaries. Pursuant to the statutory design, the Governor and the JBC used the annual salary and fringe benefits survey to determine necessary adjustments to salaries and fringe benefits for inclusion in the general appropriation bill. *See* § 24–50–104(5)(g)(I), 10B C.R.S. (1993 Supp.).

### B.

#### Gubernatorial Approval

■ In 1993, section 24–50–104(4)(d)(II) dictated that a reorganization having a fiscal impact required gubernatorial approval. The Governor approved the reorganization and communicated his approval to the JBC by letter of January 14, 1994 along with the annual survey. The General Assembly's approval of the reclassifications and pay adjustments became effective commencing the ensuing fiscal year, July 1, 1994.

### 1.

#### Deletion of Written Approval Requirement

At one time, the legislature required the Director to obtain "written approval of the Governor" when determining compensation issues pertaining to the personnel system. *See* ch. 103, sec. 2, 1953 Colo. Sess. Laws 290 (stating that written approval of the Governor is necessary when determining the value of maintenance or subsistence within the nature of compensation). In 1957, the General Assembly provided that any increase in salaries above the minimum established amount could occur only through the written approval of the Governor. *See* ch. 97, sec. 1, § 26–2–3(5), 1957 Colo. Sess. Laws 294. Beginning in 1959, the legislature deleted the requirement of "written approval" in favor of "approval" by the Governor of classification and salary issues, including reorganizations having fiscal impacts. *See* ch. 80, sec. 1, § 26–2–3(6), 1959 Colo. Sess. Laws 311.

■ We must give effect to the General Assembly's choice of wording. *See Zamarripa v. Q & T Food Stores, Inc.,* 929 P.2d 1332, 1339 (Colo.1997); *see also Colorado Ground Water v. Eagle Peak Farms,* 919 P.2d 212, 218 (Colo.1996) (holding that we "are not to presume that the legislative body used the language idly and with no intent that meaning should be given to its language"). Alexander suggests that the General Assembly has required the Director to obtain individual gubernatorial approval for the statewide job evaluation system study separate from the Governor's annual budgetary approval.

■ However, we must give effect to the entire statutory enactment. *See Meyer,* 758 P.2d at 153. The reorganization provision of

section 24–50–104(4)(d)(II), 10B C.R.S. (1993 Supp.), and the annual salary and fringe benefits provision of section 24–50–104(5)(g)(I), 10B C.R.S. (1993 Supp.), were an integral part of a statutory design that related personnel reorganization studies to the annual budgetary process. In these sections, the General Assembly did not require the Governor's separate and individual written approval of the statewide job evaluation system study. The Governor satisfied the approval requirement of section 24–50–104(4)(d)(II) when he issued his January 14, 1994 letter. With this letter, he submitted the annual survey to the JBC to implement the reorganization. This occurred as part of the budgetary process involving both the legislative and executive branches of state government pursuant to the legislature's intent.

### 2.

#### Director's Submission to Governor and the JBC

Section 24–50–104(4)(d)(II) stated that the fiscal impact of a job evaluation study could be reported to the Governor and the General Assembly through the annual salary and fringe benefits survey.

Section 24–50–104(4)(d)(II) provided in pertinent part:

In order for the *fiscal impact of any such job evaluation study to be included in the annual general appropriation bill, the results of such study shall be submitted to the joint budget committee of the general assembly no later than January 15 of each year.* Each study shall contain a detailed fiscal impact calculation by agency and department. Other than as provided in section 24–50–109.5 or in *paragraph (g) of subsection (5) of this section,* the only exception to the July 1 date regarding any assignment or reassignment of classes to pay grades, salary rates, or salary ranges, including those resulting from special salary surveys, shall be made in those urgent situations.

**8.** Section 24–50–109.5, 10B C.R.S. (1993 Supp.), pertained to fiscal emergencies that needed the Governor's immediate attention. Section 24–50–104(5)(g)(I), 10B C.R.S. (1993 Supp.), further

§ 24–50–104(4)(d)(II), · 10B C.R.S. (1993 Supp.)(emphasis added).

Section 24–50–104(4)(d)(II) established the manner by which a job evaluation study enters into the annual general appropriation bill process. This section, in turn, referred to section 24–50–104(5)(g)(I), which provided that legislative approval of the salary adjustments takes effect at the start of the next fiscal year unless the Governor orders otherwise:

The state personnel director shall, by January 7 of each year, submit to the governor the final salary and fringe benefit recommendations for the ensuing fiscal year, which report shall be published and shall include a detailed explanation of the surveys utilized to determine such recommendations. Such report shall also include the average percentage salary survey increase for all employee classes as computed annually by the state personnel director. *No later than January 15 of each year, the governor shall transmit the state personnel's report and the estimated costs for salary and fringe benefit adjustments to the joint budget committee of the general assembly for inclusion in the general appropriation bill, including with such transmittal the salary adjustments of all proposed reassignments of classes to pay grades, salary rates, or salary ranges as submitted by the state personnel director pursuant to subparagraph (II) of paragraph (d) of subsection (4) of this section, which reassignments shall take effect at the start of the ensuing fiscal year unless otherwise ordered by the governor acting pursuant to section 24–50–109.5.*[8]

§ 24–50–104(5)(g)(I), 10B C.R.S. (1993 Supp.)(emphasis added).

Alexander contends that the Governor could not have approved the reorganization and reported its fiscal impact to the JBC on January 14, 1994 because the Director on April 26 and May 2, 1994 took further action on her administrative appeal concerning the class descriptions and grade levels for the

provided that "the salary and fringe benefit recommendations of the state personnel director *shall not be appealable.*" (Emphasis added.)

positions of revenue agent and tax conferee, thus demonstrating that the job evaluation study had not been finalized. This argument ignores documentation in the record and confuses the purposes and effect of the then-existing reorganization approval and reporting provisions of sections 24-50-104(4)(d)(II) and 24-50-104(5)(g)(I), in contrast to the employee appeal provisions of section 24-50-104(4)(d)(I).[9]

■ An appellate court may draw its own conclusions from operative documentary material in the record. *See M.D.C./Wood, Inc. v. Mortimer*, 866 P.2d 1380, 1382 (Colo. 1994). The summary report of the 1994 Total Compensation Salary survey attached to the Governor's transmittal letter to the JBC clearly evidences the Governor's approval of the overall reorganization and reporting of its fiscal impact for budgetary purposes. It recites that the "new job evaluation system compressed over 1300 classes into slightly more than 900 new classes." It also contains a statement of the overall fiscal requirements to meet projected personnel salary needs for state agencies and job positions resulting from implementation of the reorganization.

■ Use of market surveys to fix and pay employee salaries is ongoing in nature as a matter of executive and legislative design. The Governor explicitly noted this in his January 14 approval and transmittal letter. The Director and the Governor's action in reporting to the JBC the results of a job evaluation study and the fiscal impacts of a consequent reorganization—and the legislature's action in response thereto through the budget process—need not await the outcome of an employee's appeal of the sufficiency of the evidence supporting the Director's action in regard to an individual's job position and salary.

The issues we accepted for certiorari review concerned the Director's and the Governor's compliance with the reorganization approval and reporting requirements and the effective date of the reorganization. We hold that these officials did comply with the applicable requirements and that the effective date of the reorganization is July 1, 1994 because the Governor did not invoke the urgent need provision or otherwise order a different effective date pursuant to sections 24-50-104(5)(g)(I) and 24-50-109.5.

The court of appeals, because it determined the reorganization to be legally ineffective, did not reach Alexander's issues on appeal concerning the sufficiency of the evidence supporting the Director's decision to decrease the salaries of the revenue agent and tax conferee positions. *See Alexander*, 952 P.2d at 819. The court of appeals identified these issues as: (1) whether the 1994 Job Evaluation Study and the subsequent decision of the Director can be supported by the Director's 1993 studies of the subject classes; (2) whether the supplemental salary surveys were improper because there was no evidence of a "serious lack of competition for jobs which are either scarce or in abundance"; and (3) whether the 1994 supplemental salary survey demonstrates consistent, careful, professional analysis. *See Alexander*, at 819. These are the issues before the court of appeals on remand.

To summarize, the record demonstrates that the Director complied with her statutory

---

**9.** Section 24-50-104(d)(I) in 1993 provided that:

Any employee directly affected by a recommendation of the department of personnel made pursuant to this subsection (4) may file a written appeal with the state personnel director within ten days after the department of personnel has published the recommended changes to the classification system. The appeal shall be heard by the director or, at his delegation, a three-member panel within sixty days after the written appeal has been received by the state personnel director. Said director or panel shall review the appeal in summary fashion on the basis of written material which may be supplemented by oral argument at the discretion of the director or panel. The director or

panel shall issue a written decision within thirty days after completion of the hearing. A classification system determination may be overturned only if the director or panel finds it to have been arbitrary, capricious, or contrary to rule or law. If the director or panel does not issue such decision within thirty days of completion of the hearing, the classification system determination shall be final. Any decision of the panel or final action of the state personnel director shall be subject to judicial review pursuant to section 24-4-106.

§ 24-50-104(4)(d)(I), 10B C.R.S. (1993 Supp.). This statutory provision has been modified and is now contained in section 24-50-105(6)(b)(II), 7 C.R.S. (1998).

mandate. She submitted the annual salary and fringe benefit recommendations to the Governor. These recommendations addressed the Department of Personnel's implementation of the new job evaluation system. The Governor submitted his approval of the study results and salary adjustments to the JBC by letter of January 14, 1994. The legislature's implementation of the reorganization became effective as of July 1, 1994, the start of the fiscal year.[10] *See* § 24–30–204, 10B C.R.S. (1993 Supp.).

### III.

Accordingly, we uphold the decision of the district court affirming the agency action, but on different grounds. We reverse the judgement of the court of appeals and remand with directions to return this matter to the district court and to the agency for further proceedings consistent with this opinion after the court of appeals has addressed any other issues that remain on appeal.

Justice KOURLIS does not participate.

### *APPENDIX A*

STATE OF COLORADO
EXECUTIVE CHAMBERS
136 State Capitol
Denver, Colorado 80203–1792
Phone (303) 866–2471

January 14, 1994      (state seal)

Roy Romer

Governor

The Honorable Tony Grampsas
Chairman
Joint Budget Committee
200 E. 14th Ave.
Denver, CO 80203

Dear Tony:

According to Colorado Revised Statutes, 24–50–104(5)(g)(I), I am sending you the results of the 1994 Total Compensation Survey conducted by the Department of Personnel, including the estimated fiscal impacts. Please note that the report identifies 12–month costs for base salary and premium pay adjustments and seven-month costs for employee benefits adjustments. Employee benefits costs are calculated for a seven-month period to reflect calendar year benefit plans.

I support the statutory philosophy that total compensation for classified employees be comparable to our competitive labor market. The salary and benefit recommendations contained in the report are consistent with that philosophy. I support full funding of these recommendations and implementation without any delays; July 1, 1994, for salary and premium pay adjustments and December 1994 employer premiums for benefit enhancements. I hope we are able to work together to implement as many of these recommendations as possible.

Thanks to our joint efforts over the past several years, we have made significant progress toward achieving prevailing state contributions for employee health plans. I hope we will be able to maintain this hard-won

---

**10.** In 1993, the Director was required to submit any study affecting positions or classes in the state personnel system to the Office of State Planning and Budgeting (OSPB) and the JBC. *See* § 24–50–110(1)(a), 10B C.R.S. (1988). Because the OSPB was involved in virtually every aspect in preparing the executive budget, *see* § 24–37–302(1), 10A C.R.S. (1988), the Governor was made aware of any changes to positions or classes in the state personnel system. Such information was needed to formulate the budget which the Governor transmitted to the JBC. In this case, the OSPB submitted an update to the budget procedures manual; this update explained that the personnel classification system revisions recommended by the statewide job evaluation system study would be implemented. The Governor accepted the recommendations

and began the implementation of the 1994 study through the survey by submitting it to the JBC. The survey referred to the positions of revenue agent and tax conferee according to the titles designated by the statewide job evaluation system study, not the titles designated prior to the statewide job evaluation system study. The proposed pay increases recommended through the statewide job evaluation system study first took effect July 1, 1994. The Department's brief notes that the Director sustained the employees' compensation rates, for a three year period, despite the approved salary decreases, under the authority of section 24–50–107, 10B C.R.S. (1993 Supp.); nevertheless, the study's reclassifications and pay adjustments became effective on July 1, 1994, as part of the appropriation bill process.

achievement in this year's budget. I also hope that we can continue our progress toward flexible total compensation, which will allow classified employees to take an active role in maximizing the value of their individual compensation package. We have partially achieved this with our recent medical plan choices for classified employees.

I look forward to working with you and the General Assembly in the weeks ahead as you consider these survey recommendations.

Sincerely,

/s/ ROY ROMER
  Roy Romer
  Governor